Docket Nos. 100681, 102584 cons.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. MICHAEL P. COSBY, Appellee.–THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. HUGO MENDOZA, Appellee.

*Opinion filed September 18, 2008.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Thomas and Karmeier concurred in the judgment and opinion.

Justice Freeman concurred in part and dissented in part, with opinion, joined by Justices Kilbride and Burke.

## OPINION

These consolidated cases involve unrelated traffic stops of vehicles driven by defendants Cosby and Mendoza.

### BACKGROUND
### Michael Cosby

The State initially charged Cosby with unlawful possession of drug paraphernalia (720 ILCS 600/3.5 (West 2000)) and unlawful possession of cocaine (720 ILCS 570/402(c) (West 2000)), resulting

from a search of Cosby's vehicle and of a cigarette pack belonging to Cosby. The drug paraphernalia charge was later nol-prossed by the State. Cosby filed a motion to suppress evidence. Trial counsel and the State stipulated to the admission of the police report written by Officer Steven Kaus and then presented arguments to the circuit court of Will County. The police report is not in the record on appeal. However, the appellate court stated the stipulation provided that Kaus would testify that he stopped Cosby for not having a proper rear registration light. Cosby provided valid insurance information and a speeding ticket in lieu of a driver's license. Kaus returned to his squad car and called for backup. He verified that Cosby had a valid driver's license and that there were no outstanding warrants for his arrest. When the backup officer arrived, Kaus approached Cosby's car, returned his speeding ticket and insurance card to him, and gave Cosby a warning for the rear light violation. Kaus then asked for consent to search Cosby's car. Cosby consented. Kaus found drug paraphernalia in the console of the car and he arrested Cosby.

The trial court denied the motion to suppress, but did not explain its reasoning.

At Cosby's trial, Kaus testified that at approximately 1:30 a.m. on July 12, 2001, he stopped Cosby's car for having no rear license plate light. Cosby handed him a speeding ticket and an insurance card. Kaus went back to his squad car, where he called for backup in anticipation of requesting Cosby's consent to search his car. About five minutes later, the backup officer arrived. Kaus went back to Cosby's car, returned the speeding ticket and insurance card, and gave Cosby a written warning about the rear registration light. Kaus then asked Cosby for consent to search his car, which Cosby gave. Prior to searching the car, Kaus asked for and received consent from Cosby to search his person. Cosby removed all items from his pockets, Kaus inspected them, and Cosby replaced the items in his pockets. Kaus then proceeded to search Cosby's car. Kaus found a crack pipe in the car's center console. He placed Cosby under arrest and took him to the police station. There, Cosby emptied his pockets and placed his property on a tray, including a package of cigarettes. Cosby called his wife to come to the jail and post bond. As Kaus was giving Cosby back his property, he discovered four rocks of crack cocaine hidden within the cigarette packaging.

The jury convicted Cosby of the possession charge and, following a sentencing hearing, the trial court sentenced Cosby to 24 months of probation, six months in the county jail, and payment of fines. Trial counsel filed a motion to reconsider sentence, which was denied. Counsel did not file a posttrial motion.

Cosby appealed, arguing that the trial court erred in denying his motion to suppress evidence. The appellate court first addressed Cosby's forfeiture of his argument on appeal, noting that Cosby had failed to preserve the issue in a posttrial motion. However, the appellate court elected to consider the issue, "[b]ased on the constitutional nature and underlying implication of the alleged error." Relying on this court's decision in *People v. Gonzalez*, 204 Ill. 2d 220 (2003), the appellate court held that Kaus' questioning of Cosby and his search of Cosby's car were unrelated to the circumstances justifying the stop, that Kaus lacked any reasonable, articulable suspicion that would support his further detention and questioning of Cosby, and that Kaus' actions impermissibly prolonged Cosby's detention and changed the fundamental nature of the stop. Accordingly, the appellate court held that the motion to suppress should have been granted. *Cosby*, No. 3–03–0681 (unpublished order under Supreme Court Rule 23).

Justice Schmidt dissented, arguing that *Gonzalez* has been implicitly overruled by the United States Supreme Court's decision in *Illinois v. Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005). Relying on other decisions of this court and the Supreme Court, Justice Schmidt would have found the search of Cosby's car legal on the basis of a valid consent.

We granted the State's petition for leave to appeal (210 Ill. 2d R. 315(a)).


Hugo Mendoza

Mendoza was charged in the circuit court of Kane County with unlawful use of a weapon (720 ILCS 5/24–1.6(a)(1), (a)(3)(A) (West 2002)). Mendoza's trial counsel filed a motion to suppress evidence. A hearing on that motion was held, at which two police officers testified. At about 11 p.m. on May 10, 2004, two Aurora police officers, Inspectors Jeff Wiencek and Joe Weber, observed Mendoza

driving his Pontiac Grand Prix sedan. They noted that the car's rear license plate cover was tinted, in violation of Illinois law. They also noticed a red bandana hanging from the rearview mirror of Mendoza's car, which they considered a gang symbol of the Vice Lords. In addition, the officers determined the bandana to be large enough to obstruct Mendoza's view, which was also a violation of Illinois law. The officers pulled Mendoza over. Pursuant to their request, Mendoza handed them his driver's license and proof of insurance.

After determining that the license and insurance card were valid and that Mendoza had no outstanding warrants, the officers decided to ask Mendoza for permission to search his car. In explaining this decision, Wiencek, who had been a gang investigator for seven years, testified that the neighborhood was known for its gang activity. Although Wiencek did not know whether Mendoza was a gang member, he knew from covert surveillance, police reports, and interviewing people that Mendoza was an "affiliate" of the Vice Lords. Mendoza had been seen in the presence of gang members. The bandana hanging from Mendoza's rearview mirror was red, which was one of the colors used by the Vice Lords. Using the bandana was one way of signifying affiliation with the gang. The officers were concerned that Mendoza might have a gun in his car. After checking Mendoza's driver's license and insurance, the officers returned to the car, one on each side. Weber returned Mendoza's license and insurance card, gave him a verbal warning, and asked him if he had anything illegal in the car. Mendoza responded that he did not. Weber then asked Mendoza for permission to search his car. Mendoza refused consent.

Meanwhile, Wiencek, who was standing on the passenger side of the car, shined his flashlight inside the car and saw the butt of a gun sticking out from under the driver's seat between Mendoza's feet. Not wanting to create a hostile situation by drawing his gun on Mendoza, Wiencek tried to surreptitiously signal Weber to the presence of the gun. However, Weber was talking to Mendoza and Wiencek could not get Weber's attention. After Mendoza refused consent to search his car, Weber told him he was free to leave. Mendoza started to drive away and Wiencek told Weber about the gun. Weber yelled at Mendoza to stop, but he did not. The two officers got into their squad

car and drove after Mendoza. Wiencek could see Mendoza's head and shoulders moving, but could not tell what he was doing. Weber did not notice any movement. The officers pulled Mendoza over again. They ordered Mendoza to exit the car. They handcuffed him and patted him down. Wiencek searched the car. Although Wiencek did not find a gun under the driver's seat, he found a handgun underneath a plastic tray in the center console of Mendoza's car.

The trial court, relying on *Gonzalez*, granted Mendoza's motion, concluding that Weber's questions to Mendoza after the traffic stop was concluded were neither related to the traffic stop nor justified by a reasonable suspicion of additional criminal activity. Since the gun was not discovered until the officers had already violated the fourth amendment by their questioning of Mendoza, the trial court found that the gun would not have been discovered absent the violation. The State appealed.

The appellate court rejected the trial court's reliance on *Gonzalez*. However, the court nonetheless affirmed the trial court's grant of Mendoza's motion to suppress. The court reasoned that *Gonzalez* only applies to traffic stops that are still ongoing. Once Weber returned Mendoza's driver's license and insurance card to him, the traffic stop concluded and Mendoza was free to leave. Thus, the proper inquiry is whether Weber's questioning amounted to a second seizure. Questioning constitutes a seizure if, in light of the circumstances, a reasonable person would not have felt free to leave. If there is a seizure, the fourth amendment is violated if there is no constitutional justification for it. The appellate court concluded that Mendoza was seized, noting the presence of more than one officer, that Mendoza was not told he was free to leave, that the officers used a "flanking maneuver" in which one officer stood on each side of the car, and that Wiencek shined a flashlight into the car. The court further found that the officers lacked either probable cause or a reasonable articulable suspicion that Mendoza had committed or was about to commit a crime. The court noted that Wiencek did not see the gun until after Mendoza was seized. Thus, this fact could not support the seizure of Mendoza once the traffic stop was concluded. *Mendoza*, 364 Ill. App. 3d 564, 581. We allowed the State's petition for leave to appeal (210 Ill. 2d R. 315(a)) and consolidated this case with the appeal in People v. Cosby.

ANALYSIS

Standard of Review

This court recently set forth the applicable principles in *People v. Luedemann*, 222 Ill. 2d 530 (2006):

> "In reviewing a trial court's ruling on a motion to suppress evidence, we apply the two-part standard of review adopted by the Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663, (1996). Under this standard, a trial court's findings of historical fact should be reviewed only for clear error, and a reviewing court must give due weight to any inferences drawn from those facts by the fact finder. *Ornelas*, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663. In other words, we give great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). Accordingly, we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted. *Ornelas*, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663; *Pitman*, 211 Ill. 2d at 512; *Sorenson*, 196 Ill. 2d at 431." *Luedemann*, 222 Ill. 2d at 542-43.

People v. Cosby, No. 100681

Initially, we note that Cosby failed to file a posttrial motion raising the issue of the trial court's denial of his motion to suppress evidence. Instead, his trial counsel filed only a motion to reconsider sentence. The State argues that Cosby has therefore forfeited any argument that the trial court erred in denying his motion to suppress. It also argues that the appellate court should not have addressed Cosby's argument.

To preserve an alleged error for review, a defendant must raise a timely objection at trial and raise the error in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). This long-

standing rule is consistent with section 116–1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116–1 (West 2006) (governing procedure for filing motion for new trial)) and serves the purpose of allowing the trial court " 'the opportunity to grant a new trial, if warranted.' " *Enoch*, 122 Ill. 2d at 186, quoting *People v. Caballero*, 102 Ill. 2d 23, 31-32 (1984). Nonetheless, in a criminal case, an issue not properly preserved may still be raised on appeal under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), which provides:

> "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."

The appellate court did not engage in plain-error review. Instead, the court reviewed Cosby's forfeited argument "[b]ased on the constitutional nature and underlying implication of the alleged error."

This court conducted an extensive review of the plain-error rule in *People v. Herron*, 215 Ill. 2d 167 (2005), where we stated:

> "The plain-error doctrine, as it has developed in Illinois, allows a reviewing court to reach a forfeited error affecting substantial rights in two circumstances. First, where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence, a reviewing court may consider a forfeited error in order to preclude an argument that an innocent person was wrongly convicted. [Citation.] Second, where the error is so serious that the defendant was denied a substantial right, and thus a fair trial, a reviewing court may consider a forfeited error in order to preserve the integrity of the judicial process. [Citations.] This so-called disjunctive test does not offer two divergent interpretations of plain error, but instead two different ways to ensure the same thing–namely, a fair trial." *Herron*, 215 Ill. 2d at 178-79.

The appellate court emphasized the constitutional nature of the alleged error in deciding to review Cosby's argument despite his forfeiture. However, the mere fact that an alleged error affects a constitutional right does not provide a separate ground for review, for "even constitutional errors can be forfeited." *People v. Allen*, 222 Ill.

-7-

2d 340, 352 (2006). Thus, the appellate court erred in addressing Cosby's forfeited argument on this basis.

However, we note that the first step in plain-error review is to determine whether error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) ("the first step is to determine whether error occurred in the giving of the instruction"). Absent reversible error, there can be no plain error. *Herron*, 215 Ill. 2d at 187; *People v. Williams*, 193 Ill. 2d 306, 349 (2000). Accordingly, we first determine whether any error occurred in Cosby's case.

The fourth amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. In addition, article I, section 6, of the Illinois Constitution of 1970 provides that "[t]he people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means." Ill. Const. 1970, art. I, §6.

Initially, we must determine the proper framework for our analysis. The United States Supreme Court has characterized the detention by police of individuals during a traffic stop as a "seizure" of "persons" within the meaning of the fourth amendment. *Berkemer v. McCarty*, 468 U.S. 420, 436-37, 82 L. Ed. 2d 317, 332-33, 104 S. Ct. 3138, 3148 (1984), citing *Delaware v. Prouse*, 440 U.S. 648, 653, 59 L. Ed. 2d 660, 667, 99 S. Ct. 1391, 1396 (1979). A person is seized when, by means of physical force or a show of authority, the person's freedom of movement is restrained. *United States v. Mendenhall*, 446 U.S. 544, 553, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980). The Supreme Court further elaborated on that point:

> "We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person

of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.

This court adopted the *Mendenhall* factors in *People v. Murray*, 137 Ill. 2d 382, 390 (1990).

In *Berkemer*, a case involving the application of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), to traffic stops, the Supreme Court observed that the "usual traffic stop" is more analogous to a so-called *Terry* stop (see *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)) than to a formal arrest. *Berkemer*, 468 U.S. at 439, 82 L. Ed. 2d at 334, 104 S. Ct. at 3150. However, the Court cautioned in a footnote that "[n]o more is implied by this analogy than that most traffic stops resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*. We of course do not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a *Terry* stop." *Berkemer*, 468 U.S. at 439 n.29, 82 L. Ed. 2d at 334 n.29, 104 S. Ct. at 3150 n.29.

Nonetheless, this court and many other courts have analyzed traffic stops under *Terry* principles, regardless of whether the initial stop was supported by probable cause or reasonable suspicion. See, *e.g.*, *People v. Gonzalez*, 204 Ill. 2d 220 (2003) (and cases cited therein); *People v. Bunch*, 207 Ill. 2d 7 (2003).

In *Gonzalez*, this court applied *Terry* principles to a traffic stop during which a police officer requested identification from the defendant, who was a passenger in the stopped vehicle. Citing *Berkemer*, we noted that, because the usual traffic stop is more analogous to a *Terry* investigative stop than to a formal arrest, a fourth amendment challenge to the reasonableness of a traffic stop is analyzed under *Terry* principles. A *Terry* analysis involves a dual inquiry: (1) whether the officer's action was justified at its inception, and (2) whether the action was reasonably related in scope to the circumstances that justified the interference in the first place. *Gonzalez*, 204 Ill. 2d at 228-29. We concluded that the officers' stop of the vehicle was supported by probable cause. Thereafter, we set forth an analytical framework to use in determining whether police questioning during a traffic stop violates the fourth amendment. First,

-9-

with respect to *Terry*'s scope requirement, a court must determine whether the questioning is related to the initial justification for the stop. If the questioning is so related, no fourth amendment violation occurs. If the questioning is not reasonably related to the purpose of the stop, the court must determine whether the officer had a reasonable, articulable suspicion that would justify the questioning. If so, there is no fourth amendment violation. In the absence of a reasonable, articulable suspicion, the court must consider whether, in light of the totality of the circumstances, the questioning impermissibly prolonged the detention or changed the fundamental nature of the stop. *Gonzalez*, 204 Ill. 2d at 235.

The State argues that this case is not controlled by *Gonzalez*. Alternatively, the State also argues that if this court finds that a *Gonzalez* analysis is required, we should reconsider *Gonzalez* and overrule it as inconsistent with fourth amendment jurisprudence. The State also contends that *Gonzalez* has been implicitly overruled by the United States Supreme Court's decision in *Illinois v. Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005).

We have very recently held in *People v. Harris*, 228 Ill. 2d 222, 240 (2008), that our decision in *Gonzalez* has been "unequivocally overruled" by the United States Supreme Court's decision in *Muehler v. Mena*, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465 (2005). As we noted in *Harris*, *Muehler* makes clear that the Court, in *Caballes*, rejected the reasoning that led to this court's adoption of the " 'fundamental alteration of the nature of the stop' " portion of the " 'scope' " prong of *Gonzalez* and that all that remains of the scope prong is the "duration" portion of that analysis. *Harris*, 228 Ill. 2d at 242. Thus we overruled *Gonzalez* to the extent it holds that the reasonableness of a traffic stop must be judged by whether the officer's conduct altered the fundamental nature of the stop. *Harris*, 228 Ill. 2d at 244.

The appellate court in Cosby's case found that the traffic stop was unreasonably prolonged. While Cosby argues before this court that there was no break between the conclusion of the traffic stop and the officer's request for consent to search, we conclude that the record does not support such an argument. The requests for consent to search in both of the instant cases followed the officers' returning of the defendants' paperwork. At that point, the traffic stops came to an end.

The relevant question is whether the officers' actions after the initial traffic stops had concluded constituted a second seizure of either defendant.

Thus, the question before us in Cosby's case is whether Kaus' request to search Cosby's car after the traffic stop had ended constituted a new seizure for fourth amendment purposes. We analyze this question under the principles set forth in *Brownlee* and *Mendenhall*.

In *Brownlee*, the defendant was a passenger in a car stopped by two police officers for traffic violations. After securing identification from the driver and all passengers and determining that no outstanding warrants existed, the officers decided not to issue any traffic citations. The officers returned to the car, one on each side. One officer returned to the driver his driver's license and insurance card and explained that no citations would be issued. Then, the officers paused for a couple of minutes, saying nothing. They continued to stand one on each side of the car. Following this pause, one of the officers requested permission to search the car. The driver asked whether he had a choice in the matter, to which the requesting officer answered that he did. The driver consented to the search. The officers found marijuana and an open beer bottle in the car. The officers arrested the car's occupants and, during a search of the defendant's person incident to her arrest, they found cocaine. *People v. Brownlee*, 186 Ill. 2d 501, 506-07 (1999).

The trial court granted the defendant's motion to quash her arrest and suppress evidence; the appellate court reversed and remanded. Applying *Terry* principles to the officers' actions following the conclusion of the traffic stop, this court concluded that the officers effected a seizure of the car's occupants by flanking the car while saying nothing for a period of two minutes. Citing *Mendenhall*, we noted that a person is seized when, in view of all the facts and circumstances, the person would not feel free to leave. *Brownlee*, 186 Ill. 2d at 517. Because the officers had no probable cause or reasonable suspicion to detain the occupants, this show of authority constituted an illegal seizure in violation of the fourth amendment. Under the circumstances, this court found that a reasonable person would have concluded that he or she was not free to leave. *Brownlee*, 186 Ill. 2d at 520.

We do not find the presence of any of the *Mendenhall* factors in Cosby's case. Cosby argues that the presence of two police officers suggests coercion. That there were two officers present here, however, does not weigh in favor of finding a seizure. *Mendenhall* referenced the presence of "several" officers. In *Luedemann*, one officer approached a parked car in which the defendant was sitting. When the officer observed signs of intoxication, he radioed for backup. Another officer arrived on the scene and the officers approached the defendant's car, one on each side. In discussing whether the defendant was seized by the officers' actions, this court noted that none of the *Mendenhall* factors were present. *Luedemann*, 222 Ill. 2d at 553. It is clear, then, that the presence of only two officers, without more, is not a factor that would indicate a seizure occurred.

There is no indication in the record that either of the officers touched Cosby's person, that they displayed their guns, or that Kaus used language or a tone of voice indicating to Cosby that he had no choice but to consent to the search of his car. Cosby emphasizes that Kaus did not tell him that he was free to leave prior to requesting consent to search. However, while this is a factor to consider, the Supreme Court has held that such advice is not required. See *Ohio v. Robinette*, 519 U.S. 33, 35, 136 L. Ed. 2d 347, 352, 117 S. Ct. 417, 419 (1996).

Cosby also argues that he did not feel free to leave because Kaus treated the request to search as if it were part of the traffic stop. Cosby maintains that the officer asked for consent to search "in the same breath" as he explained the warning and returned Cosby's paperwork to him. According to Cosby, this made it less likely that he would feel free to leave. However, the appellate court's recitation of the stipulated police report that formed the basis of the suppression hearing does not support this argument. In addition, at Cosby's trial, Kaus simply testified that he "explained the nature of the written warnings for no license plate light. I gave him back his paperwork, and then I asked him consent to search the Pontiac." This testimony simply indicates that shortly after returning Cosby's paperwork to him, Kaus requested consent to search the car.

Cosby further argues that all of the circumstances of the traffic stop, taken together, strongly suggest that he was not free to leave at

the time Kaus requested consent to search. Cosby highlights the following: (1) the presence of two officers; (2) the stop took place in the early morning hours in a deserted and poorly lit locale; and (3) the officers' "double teaming" of Cosby at his car at the time of the request. Cosby asserts that the two officers were standing on either side of his car at the time Kaus requested to search the car. However, the record contains no suggestion that the officers surrounded the car, as Cosby claims. Thus, Cosby's citation of this court's decision in *People v. Gherna*, 203 Ill. 2d 165 (2003), is unavailing. There, two police officers on bicycles positioned themselves on either side of the defendant's truck, questioned the defendant and her daughter about their identities, and eventually asked the defendant to exit the vehicle for further questioning. This court held that, under the totality of the circumstances, these actions constituted a show of authority to which a reasonable person would feel compelled to submit. We noted that the positioning of the officers and their bicycles prevented the defendant from either exiting her vehicle or driving away. *Gherna*, 203 Ill. 2d at 180.

In his partial concurrence and partial dissent, Justice Freeman accuses the majority of relying exclusively on the factors set forth in the *Mendenhall* decision in determining that Cosby was not seized when he was asked for consent to search his car. The dissent quotes our decision in *Luedemann*, where we said that the *Mendenhall* factors " 'are not exhaustive and that a seizure can be found on the basis of other coercive police behavior that is similar to the *Mendenhall* factors.' " Slip op. at 27 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride and Burke, JJ.), quoting *Luedemann*, 222 Ill. 2d at 557. The dissent observes that we noted other factors in addition to those set forth in *Mendenhall* that may indicate a seizure of the occupants "of a parked vehicle." *Luedemann* noted that courts have developed additional rules that are applicable to "police approaches of occupants of parked vehicles." *Luedemann*, 222 Ill. 2d at 557. Those factors include boxing the vehicle in, approaching it on all sides by many officers, pointing a gun at the suspect, and ordering the suspect to place his or her hands on the steering wheel, or the use of flashing lights as a show of authority. *Luedemann*, 222 Ill. 2d at 557.

-13-

The additional factors, however, only apply to situations where police approach a parked vehicle, which was the case in *Luedemann*. The fact that Cosby's car was parked on the side of the road after Kaus effected a traffic stop does not make the additional factors applicable. However, even were those factors to be applied, it is clear that only one of them–flashing lights–is present in Cosby's case. The officers here did not box Cosby's car in; both officers' cars were located behind Cosby's car. His car was not approached on all sides and there were two officers, not many. There is no evidence that either officer pointed a gun at Cosby and no evidence that Cosby was ordered to place his hands on the steering wheel.

The dissent complains that, by focusing on the *Mendenhall* factors and by not considering the additional factors set forth in *Luedemann*, the majority leaves the impression that the *Mendenhall* factors are the exhaustive factors for determining whether a person is seized within the meaning of the fourth amendment. The dissent is concerned that our reliance upon the *Mendenhall* factors "calls into question the continued viability of our analysis in *Luedemann*, a unanimous decision that is less than two years old." Slip op. at 30 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride and Burke, JJ.). It is true that the *Mendenhall* factors are not exhaustive and that a seizure may be found on the basis of other coercive police conduct similar to the *Mendenhall* factors. *Luedemann*, 222 Ill. 2d at 557. However, we note that *Luedemann* itself addressed the effect that use of the *Mendenhall* factors has on the analysis of whether a seizure occurred. We noted that this court, in *Murray*, adopted the factors, reviewed each of the factors, found that they were absent, and concluded that no seizure had occurred. *Luedemann*, 222 Ill. 2d at 553-54. In addition, *Luedemann* noted that this court in *People v. Smith*, 214 Ill. 2d 338, 353-54 (2005), relied on the absence of the *Mendenhall* factors to conclude that no seizure had taken place. *Luedemann*, 222 Ill. 2d at 554. We further observed:

> "Indeed, *Mendenhall itself* used an analysis based on the absence of *Mendenhall* factors. The lead opinion listed the four factors, noted their absence, and then concluded that no seizure had occurred. [Citation.] From the very minute the *Mendenhall* factors were created, courts have used their absence to determine that seizures had not occurred.

-14-

Even in the absence of cases such as *Mendenhall*, *Murray*, and *Smith*, it would seem self-evident that the absence of *Mendenhall* factors, while not necessarily conclusive, is highly instructive. If those factors are absent, that means that only one or two officers approached the defendant, they displayed no weapons, they did not touch the defendant, and they did not use any language or tone of voice indicating that compliance with their requests was compelled. Obviously, a seizure is much less likely to be found when officers approach a person in such an inoffensive manner." (Emphasis in original.) *Luedemann*, 222 Ill. 2d at 554.

Despite the absence of any of the *Mendenhall* factors in Cosby's case, the dissent expresses the belief that we must look to the totality of the circumstances to determine whether Cosby was seized at the time Kaus asked him for consent to search his car. This court in *Luedemann* addressed a similar contention which had been made by the appellate court in that case:

"The appellate court believed that, because *Mendenhall* stated that courts should look to the totality of the circumstances in determining whether a seizure had occurred, the court must conduct a 'practical, realistic' inquiry to determine if a reasonable person would have felt free to leave and that the court should not focus on rigid, technical rules such as the *Mendenhall* factors. [Citation.] The problem with this view is that, immediately after *Mendenhall* said that a person is seized if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave' [citation], it elaborated on how courts are to make that determination. The lead opinion listed several factors that are generally indicative of a seizure, said that in the absence of some such evidence otherwise inoffensive contact between a member of the public and the police is not a seizure, and then concluded that no seizure had occurred because those factors were not present. [Citation.] This court expressly adopted those factors in *Murray*. The 'in view of all the circumstances' language must be read in concert with, not in opposition to, the factors. [Citation.] The factors illustrate what type of police conduct

would give a reasonable person an objective reason to believe that he or she was not free to leave or was not free to decline an officer's requests." *Luedemann*, 222 Ill. 2d at 554-55.

The reality in Cosby's case is that none of the *Mendenhall* factors are present. Therefore, the dissent's insistence that Cosby was seized is not supported by the record.

The dissent faults the majority for not citing this court's decision in *Bunch*, which the dissent views as similar to Cosby's situation. However, in *Bunch*, the defendant was removed from the car and directed to stand at the rear of the car alongside the handcuffed driver. The officer stood a foot away from the defendant and shined his flashlight in the defendant's face, while asking him questions. This court considered the officer's actions to be coercive in nature and to constitute a show of authority, such that, even though the traffic stop had come to an end, the defendant was seized anew. *Bunch*, 207 Ill. 2d at 19-20. The facts in *Bunch* are not at all analogous to those in Cosby's case. Thus, *Bunch* provides no authority for the dissent's conclusion that Cosby was seized at the time Officer Kaus requested permission to search.

The dissent also cites this court's decision in *Brownlee*, which it contends supports its conclusion. However, *Brownlee* is no more applicable than *Bunch*. In *Brownlee*, after the driver had been handed back his paperwork by one of the two officers and had been told that no ticket would be issued, both officers, who were on opposite sides of the vehicle, stood at their stations, saying nothing. After about two minutes had elapsed, the officer standing next to the driver's door asked for permission to search the vehicle. After asking whether he had a choice, the driver consented. This court held that the officers' actions constituted a show of authority and that a reasonable person in the driver's position would not have felt free to leave. Thus, the driver and his passengers were subjected to a seizure. *Brownlee*, 186 Ill. 2d at 520-21.

Here, the record shows only that Officer Kaus approached Cosby's vehicle, returned his paperwork and asked for consent to search. There is no indication in the record that Kaus waited for any particular period of time before asking for consent. Thus, *Brownlee* is not analogous for two reasons–the record does not support any inference that both officers flanked Cosby's vehicle and there was no

show of authority like that in *Brownlee*, where both officers flanked the vehicle and waited for two minutes before asking for consent to search.

The dissent also criticizes our rejection of Cosby's argument that Officer Kaus extended the traffic stop beyond its lawful purpose because he asked for consent to search nearly simultaneously with returning Cosby's identification and proof of insurance. The dissent notes that, during argument on Cosby's motion to suppress, the prosecutor told the circuit court that Kaus "asked for consent and got the consent almost immediately as he is handing the citation to the defendant." Slip op. at 22 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride and Burke, JJ.). Arguments, of course, are not evidence. The prosecutor's statement was an attempt to answer defense counsel's citation of *Brownlee* to the court as being similar to Cosby's case. Counsel had argued that the action of Officer Kaus in calling for backup without any reasonable suspicion of criminal activity was essentially a show of authority by Kaus indicating to Cosby that he did not have the right to leave and that he must consent to the search. The prosecutor's statement was, at most, his own interpretation of matters contained in the police report. We do not know what is contained in the police report because it is not in the record on appeal. However, we do know that, at the trial, no testimony was elicited on direct or cross-examination as to the timing of Officer Kaus' request for consent to search as it related to the returning to Cosby of his paperwork. Nothing in Kaus' testimony gives rise to any inference one way or the other. Accordingly, to the extent the dissent's conclusions about the duration of the traffic stop and Cosby's alleged seizure depend on the belief that Officer Kaus simultaneously requested consent to search as he was handing Cosby his paperwork, they are unsupported by the record. For all these reasons, we respectfully disagree with the dissent's conclusions.

Accordingly, applying the principles of *Brownlee* and *Mendenhall*, we conclude that Cosby was not seized and that his consent to search his car was therefore voluntary. The trial court's decision denying Cosby's motion to suppress was therefore not in error. Because no error occurred, we need not consider the application of plain error to this appeal.

Initially, we note that Mendoza has not filed an appellee's brief in this court. Nonetheless, we will decide the merits of this appeal under the principles set forth in *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976) (where the record is simple and the claimed errors are such that the reviewing court can decide them without the assistance of an appellee's brief, the court should address the merits of the appeal).

The trial court here applied the *Gonzalez* analysis to the facts surrounding the traffic stop of Mendoza's car and granted Mendoza's motion to suppress. While the appellate court agreed with the result reached by the trial court, the appellate court disagreed as to the application of *Gonzalez* to the facts of the case. The appellate court concluded that, by its very terms, *Gonzalez* applies only to police questioning *during* a traffic stop. The court noted that *Gonzalez* involved police questioning of a passenger during the traffic stop, whereas in the present case, the traffic stop had concluded prior to Weber's asking Mendoza for permission to search his car. Thus, according to the appellate court, the proper inquiry is whether Weber's questions amounted to a second seizure. The court opined that the proper analysis to apply to that inquiry is the one set forth by this court in *Brownlee*. The court then concluded that Mendoza was seized and the evidence recovered from his car must be suppressed. *Mendoza*, 364 Ill. App. 3d at 574.

It is clear that the traffic stop of Mendoza's car had come to an end prior to the questioning of Mendoza by Weber. In addition, we note there is no evidence that the officers unreasonably prolonged the traffic stop beyond the time required to fulfill its initial purpose. Therefore, we will apply the *Brownlee* analysis to Mendoza's appeal.

The State argues that Mendoza was not seized when Weber asked him if he had anything illegal in his car and requested consent to search. According to the State, the traffic stop ended when Weber returned Mendoza's driver's license and insurance card to him and gave him a verbal warning. At that point, Mendoza was no longer seized and he was free to leave. The State notes Mendoza's refusal to consent to a search of his car in support of its argument that Mendoza was not restrained by Weber's questions. The State further notes the absence of any of the *Mendenhall* factors as support for its argument.

-18-

There is no question that the initial stop of Mendoza's vehicle was supported by probable cause. The officers observed that Mendoza's car had a tinted rear license plate cover and a bandana hanging from the rearview mirror, which the officers believed obstructed Mendoza's view. As noted by the appellate court, these are violations of the traffic laws. Once Weber returned Mendoza's driver's license and insurance card to him, the purpose of the traffic stop was concluded. At that point, Weber asked Mendoza if there was anything illegal in his car, to which Mendoza replied that there was not. Weber then requested consent to search Mendoza's car. Mendoza refused. Weber then advised Mendoza that he was free to leave.

The appellate court, in finding that Mendoza was seized, focused on the following factors: (1) it was late at night; (2) the officers used a flanking maneuver in approaching Mendoza's car the second time; (3) the officers were dressed in dark, special operations uniforms with the word "POLICE" stenciled on them in large white letters; (4) the officers' guns were visible; and (5) Wiencek shined his flashlight into Mendoza's car. In view of these circumstances, the appellate court concluded that a reasonable person would not have felt free to leave. *Mendoza*, 364 Ill. App. 3d at 578.

As we have noted, the Supreme Court set forth in *Mendenhall* certain factors the presence of which would tend to indicate that a seizure had occurred. None of these factors are present in Mendoza's case. Again, these factors are: (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.

Here, there were only two officers present, not several. The appellate court noted that the officers' guns were visible. However, it is well known that police officers carry guns. The mere fact that they do so does not mean that they have thereby displayed the guns in the manner contemplated by *Mendenhall*. In any event, we note that Wiencek testified he did unholster his gun when he thought he saw the butt of a gun on the floorboard of Mendoza's car. However, he testified that he did not display the gun to Mendoza. Neither officer testified to any physical touching of Mendoza's person.

-19-

Finally, there is no suggestion that either officer spoke to Mendoza in such a manner as to convey to him the need for compliance with Weber's request to search the car. The absence of this last factor is buttressed by the fact that Mendoza refused Weber's request to search, indicating that Mendoza did not feel the need to comply with that request. The absence of all the *Mendenhall* factors strongly suggests that Mendoza was not seized for fourth amendment purposes.

The appellate court emphasized the fact that Weber did not tell Mendoza that he was free to leave after returning his driver's license and insurance card to him. As we have stated, however, the fourth amendment does not require that an officer do so. See *Robinette*, 519 U.S. at 35, 136 L. Ed. 2d at 352, 117 S. Ct. at 419. The appellate court attached some significance to the fact that Wiencek shined his flashlight into Mendoza's car. However, we have previously rejected an argument that shining a flashlight into a car at night is a factor to be considered in determining whether a seizure occurred. See *Luedemann*, 222 Ill. 2d at 560-61, citing *Texas v. Brown*, 460 U.S. 730, 739-40, 75 L. Ed. 2d 502, 512, 103 S. Ct. 1535, 1542 (1983).

We reject the appellate court's conclusion that Mendoza was seized by the officers' words and actions following the return of his driver's license and insurance card. Accordingly, the subsequent discovery of the gun, the second stopping of Mendoza's car, and the officers' search of the car did not violate Mendoza's fourth amendment rights.

CONCLUSION

For the reasons stated, in the matter of People v. Cosby, No. 100681, we reverse the judgment of the appellate court and affirm the judgment of the circuit court. In the matter of People v. Mendoza, No. 102584, we reverse the judgment of the appellate court, vacate the order of the circuit court, and remand the cause to the circuit court for further proceedings.

No. 100681–*Appellate court judgment reversed;*
*circuit court judgment affirmed.*
No. 102584–*Appellate court judgment reversed;*

*circuit court order vacated;*
*cause remanded.*

JUSTICE FREEMAN, concurring in part and dissenting in part:

In these consolidated cases, defendants were initially stopped by law enforcement officers for minor traffic law infractions. At certain points during their encounters with the officers, however, defendants were asked to consent to having their vehicles searched for contraband, and, in the case of defendant Cosby, to additionally agree to a search of his person. In both cases, the majority holds that the defendants were not seized by law enforcement officers at the time they were requested to consent to a search and, therefore, the provisions of the fourth amendment were not implicated. I strongly disagree with the majority that Cosby was not seized at the time he was asked to allow a consent search, as no reasonable person in his position would have felt free to terminate the encounter. It is my view that in Cosby's case, the majority's holding eviscerates the protections afforded to citizens under the fourth amendment by diluting the test used to such an extent that it no longer has meaning. In addition, I am seriously concerned that the majority–rather than providing needed guidance for our bench and bar with respect to this important area of the law–has created additional confusion by failing to harmonize our own precedent. Instead, the majority sends mixed messages, leaving our lower court judges and practitioners with the unenviable task of discerning the proper rules to apply. It is for this reason that although I join the majority's ultimate holding that defendant Mendoza was not seized at the time he was asked for consent, I cannot agree with the method of analysis employed to arrive at that conclusion.

## I. BACKGROUND

I begin my separate opinion with a short recitation of key background facts gleaned from the record in People v. Cosby, No. 100681. I am compelled to do so because several pivotal facts are absent from the opinion of the majority.

Cosby filed a motion to suppress evidence and, at the suppression hearing, both the prosecutor and defense counsel stipulated to the admission of the police report written by Plainfield police officer

Steven Kaus. Although counsel at the hearing described this report as being two pages in length, the majority correctly observes that it is not contained in the record on appeal. However, the transcript of proceedings at the suppression hearing sheds light on the content of this report through the arguments made by both parties on the motion. Defense counsel noted that the report indicated that Officer Kaus stopped defendant for having a burned-out rear registration light. Defendant produced a speeding ticket in lieu of a license, as well as an insurance card. Kaus returned to his squad car, found that defendant's license and insurance were valid, confirmed there were no outstanding warrants for defendant's arrest, and radioed for a backup unit to come to the scene. Defense counsel stated that "[i]n his report [Kaus] indicates that he did that [called for backup] for a possible consent search." When the second officer arrived at the scene of the stop, Kaus returned to defendant his ticket and insurance card and gave defendant a written warning citation. Defense counsel noted that "now [defendant] has two police vehicles there." Kaus then asked for and received consent to search defendant's car and discovered what he believed to be drug paraphernalia.

The prosecutor did not quarrel with defense counsel's recitation of the facts as set forth in the police report. The prosecutor did further stipulate, however, that "the report will indicate to the court the officer asked for consent and got the consent almost immediately as he is handing the citation to the defendant." The trial court subsequently denied defendant's motion to suppress; no rationale, however, was provided for this ruling. The report of proceedings in the trial court on September 16, 2002, reveals that the entirety of the trial court's statement with respect to its ruling on defendant's suppression motion consists of the following single sentence: "Show cause coming on on [*sic*] the Court's decision as to the motion to suppress, show motion to suppress is denied."

Defendant's case proceeded to trial, where Officer Kaus provided testimony that offered additional details about his encounter with defendant. Kaus testified that he was on patrol around 1:30 a.m. and was alone in a marked squad car when he observed defendant driving with a burned-out rear registration light. He stopped defendant on the shoulder of a two-lane road, which had little or no traffic, as well as poor lighting conditions with no overhead lights. Kaus stated that

during the entire time of the stop, his squad car not only had its overhead flashing blue and red lights activated, but he also had his spotlight turned on and directed at defendant's car. He approached the vehicle and asked defendant for his driver's license and proof of insurance. Defendant complied. Kaus returned to his squad car and radioed for a backup officer to come to the scene because Kaus thought there would be a possible consent search. It was Kaus' custom to stay in his vehicle until the backup officer arrived. It took approximately two minutes for him to check defendant's identification and insurance and to call for backup, and he waited approximately an extra five minutes for his backup to arrive. The second officer–Officer Klima–pulled his squad car behind Kaus' car. It was only after Klima arrived at the scene that Kaus then exited his vehicle and reapproached defendant's car. Kaus handed defendant's documents back to him and asked defendant for consent to search his vehicle. Defendant agreed, and Kaus directed him to exit his car and stand at the rear passenger side of the vehicle. Prior to conducting the search of the car, however, Officer Kaus further asked defendant if he would also consent to a search of his person. Defendant agreed and removed the contents of his pockets, including a pack of cigarettes. The officer examined defendant's effects and, finding nothing suspicious, returned them to him.

Kaus testified that he then proceeded to conduct a search of defendant's vehicle. According to Kaus, defendant remained near the rear passenger side of the car in the company of Officer Klima while Kaus searched the vehicle. Kaus found what he believed to be a crack pipe in the car's middle console. Defendant was placed under arrest for possession of drug paraphernalia and transported to the police station. There, Cosby again emptied his pockets–including the cigarettes–and placed them in a tray. At the time Cosby was to post bond and leave the station, Kaus completed an evidence report of Cosby's personal items and found four rocks of crack cocaine in the cigarette pack. Defendant was then charged with unlawful possession of a controlled substance, an offense of which he was subsequently found guilty by a jury.

The appellate court, in an order unpublished under our Rule 23, reversed the judgment of the trial court and vacated defendant's conviction. The court held, *inter alia*, that pursuant to this court's

decision in *People v. Gonzalez*, 204 Ill. 2d 220 (2003), Kaus' questioning of defendant with respect to the consent searches unreasonably prolonged the duration of the stop and resulted in defendant's being illegally detained at the time he provided consent to the search. In turn, the court held that the consent, the resulting search and the subsequent arrest were tainted, and the fruits should have been suppressed.

## II. ANALYSIS

The facts presented in these consolidated cases give rise to two threshold questions of law: whether defendants were seized within the meaning of the fourth amendment when they were requested to consent to searches by the officers, and, if so, whether that detention was unlawful. It is my view that in the case of defendant Cosby, the answer is yes. However, because the majority opinion fails to set forth the proper analytical framework to be employed in answering these questions, I am compelled to do so prior to discussing the application of these principles to the facts presented.

## A. Principles of Analysis

It is well settled that in reviewing a trial court's ruling on a motion to suppress evidence, we apply the two-part standard of review set forth by the Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996). *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Accordingly, a trial court's findings of historical fact should be reviewed only for clear error, and a reviewing court must give due weight to any inferences drawn from those facts by the fact finder. *Luedemann*, 222 Ill. 2d at 542. In other words, great deference is afforded to the factual findings made by the trial court, and, accordingly, they will be reversed only if they are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding the proper relief to be granted. *Luedemann*, 222 Ill. 2d at 542. Therefore, the trial court's ultimate

legal ruling as to whether suppression is warranted is reviewed *de novo*. *Luedemann*, 222 Ill. 2d at 542-43.

As stated, in the matter at bar, although the trial court denied Cosby's suppression motion, it failed to make any specific factual findings or credibility determinations in support of this legal holding. Instead, the trial court simply stated that defendant's "motion to suppress is denied."[1] We have previously cautioned that

> "for [the *Ornelas* two-part] standard of review to function as it is intended, trial courts must exercise their responsibility to make factual findings when ruling on motions to suppress. Reviewing courts should not be required to surmise what factual findings that the trial court made. Instead, the trial court should make clear any factual findings upon which it is relying. It is only through this synergy between the trial and reviewing courts that appellate courts can develop a uniform body of precedent to guide law enforcement officers in their determination of whether their actions may violate the constitution." *In re G.O.*, 191 Ill. 2d 37, 50 (2000).

Here, it is apparent that the trial court did not heed our admonishment in *G.O.* with respect to setting forth the factual findings supporting its decision on defendant's motion to suppress. It is therefore unclear upon what factual basis the trial court made the legal determination that defendant's suppression motion should be denied. I note that in upholding the trial court's judgment, the majority relies upon certain aspects of the factual record–facts not specifically set forth by the trial court in its ruling on the suppression motion–to conclude that Cosby was not seized at the time Officer Kaus asked him to consent to a search. I am in disagreement with this conclusion based upon my view that the record fairly and reasonably leads to the contrary legal conclusion that Cosby was unlawfully seized at the moment Kaus requested that defendant allow a consent search.

It is well settled that a person is seized by the police and entitled to challenge the actions of the officers under the protections of the

---

[1] I note that the majority, in its opinion, concedes that "[t]he trial court denied the motion to suppress, but did not explain its reasoning." Slip op. at 2.

fourth amendment when the officer, " 'by means of physical force or show of authority,' " terminates or restrains his freedom of movement. *Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 398, 111 S. Ct. 2382, 2386 (1991), quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 905 n.16, 88 S. Ct. 1868, 1879 n.16 (1968). Because a police officer may make a seizure solely by a show of authority and without the use of physical force, "there needs to be some test for telling when a seizure occurs in response to authority, and when it does not." *Brendlin v. California*, 551 U.S. ___, ___, 168 L. Ed. 2d 132, 138, 127 S. Ct. 2400, 2405 (2007). The United States Supreme Court recently reaffirmed in *Brendlin* that this test has its roots in Justice Stewart's principal opinion in *United States v. Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1879 (1980), wherein he wrote that "a seizure occurs if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Brendlin*, 551 U.S. at ___, 168 L. Ed. 2d at 138, 127 S. Ct. at 2405, quoting *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877. *Brendlin* noted that subsequent to *Mendenhall*, "the Court adopted Justice Stewart's touchstone [citations] but added that when a person 'has no desire to leave' for reasons unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.' " *Brendlin*, 551 U.S. at ___, 168 L. Ed. 2d at 138, 127 S. Ct. at 2405, quoting *Bostick*, 501 U.S. at 435-36, 115 L. Ed. 2d at 399, 111 S. Ct. at 2387; see also *People v. Luedemann*, 222 Ill. 2d 530, 548 (2006).

As stated, in conducting this inquiry, the United States Supreme Court has reaffirmed that a court must consider " 'all of the circumstances surrounding the incident' " (*Brendlin*, 551 U.S. at ___, 168 L. Ed. 2d at 138, 127 S. Ct. at 2405, quoting *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877), meaning that the court "must assess the coercive effect of police conduct taken as a whole." *Luedemann*, 222 Ill. 2d at 555 n.6, citing *Michigan v. Chesternut*, 486 U.S. 567, 573, 100 L. Ed. 2d 565, 572, 108 S. Ct. 1975, 1979 (1988). The *Mendenhall* Court set forth examples of circumstances that may indicate a seizure, including the "threatening presence of several officers, the display of a weapon by an officer,

some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877 (principal op.). We have recently held, however, that the factors set forth in *Mendenhall* "are not exhaustive and that a seizure can be found on the basis of other coercive police behavior that is similar to the *Mendenhall* factors." *Luedemann*, 222 Ill. 2d at 557; see also *People v. Bunch*, 207 Ill. 2d 7, 20 (2003) (absence of the *Mendenhall* factors are not conclusive, as an officer's show of authority may be manifested in other ways). Our opinion in *Luedemann* adopted several examples set forth by Professor LaFave in his fourth amendment treatise–in addition to those listed in *Mendenhall*–that may be indicative of a seizure of an individual who is approached by officers while seated in a parked vehicle: " 'boxing the car in, approaching it on all sides by many officers, pointing a gun at the suspect and ordering him to place his hands on the steering wheel, or use of flashing lights as a show of authority.' " *Luedemann*, 222 Ill. 2d at 557, quoting 4 W. LaFave, Search & Seizure §9.4(a), at 434-45 (4th ed. 2004).[2] The analysis of whether an individual is seized for purposes of the fourth amendment requires an objective evaluation of the police conduct in question and does not turn upon the subjective perception of the person involved. *Luedemann*, 222 Ill. 2d at 551.

It is well settled that a traffic stop entails a seizure within the meaning of the fourth amendment " 'even though the purpose of the stop is limited and the resulting detention quite brief.' " *Brendlin*, 551 U.S. at ___, 168 L. Ed. 2d at 138, 127 S. Ct. at 2406, quoting *Delaware v. Prouse*, 440 U.S. 648, 653, 59 L. Ed. 2d 660, 667, 99 S. Ct. 1391, 1396 (1979); see also *Bunch*, 207 Ill. 2d at 13. Vehicle stops are subject to the fourth amendment's requirement of reasonableness, which is analyzed under *Terry* principles. *Bunch*, 207 Ill. 2d at 13-14; *Gonzalez*, 204 Ill. 2d at 228. This involves a dual inquiry: "whether the officer's action was justified at its inception," and "whether it was reasonably related in scope to the circumstances

---

[2]According to Professor LaFave, these examples highlight "why vehicle stops are generally viewed as seizures while pedestrian encounters typically are not." 4 W. LaFave, Search & Seizure §9.4(a), at 436-38 (4th ed. 2004).

which justified the interference in the first place." *Terry*, 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879. As we recently held in *People v. Harris*, No. 103796, slip op. at 16 (March 20, 2008), the scope prong of *Terry* examines the duration of the detention, and requires that it not be "unreasonably prolonged."[3] See also *Brendlin*, 551 U.S. at ___, 168 L. Ed. 2d at 138, 127 S. Ct. at 2406. It is also well settled that a seizure that is lawful at its inception can nevertheless violate the fourth amendment "if the manner of execution unreasonably infringes interests protected by the constitution." *Illinois v. Caballes*, 543 U.S. 405, 407, 160 L. Ed. 2d 842, 846, 125 S. Ct. 834, 837 (2005). For example, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407, 160 L. Ed. 2d at 846, 125 S. Ct. at 837.

In the matters at bar, no issue exists concerning the lawfulness of the initial stops of the vehicles. Rather, these appeals concern the constitutional propriety of the conduct of the officers following the initial stops. Where an officer asks a motorist questions about contraband or consent to search the vehicle after a valid detention, the inquiry is whether the consent to search was valid, which, in turn, rests upon whether the consent was voluntary. *Ohio v. Robinette*, 519 U.S. 33, 40, 136 L. Ed. 2d 347, 354, 117 S. Ct. 417, 421 (1996). " '[V]oluntariness is a question of fact to be determined, from all of the circumstances.' " *Robinette*, 519 U.S. at 40, 136 L. Ed. 2d at 354, 117 S. Ct. at 421, quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49, 36 L. Ed. 2d 854, 875, 93 S. Ct. 2041, 2059 (1973). This inquiry, therefore, dovetails with the question of whether the motorist was seized at the time the officer asked the questions and whether that seizure was reasonable. A consent obtained during an illegal detention is ordinarily ineffective to justify an otherwise invalid

---

[3]As the majority notes, our decision in *Harris* partially overruled *Gonzalez* to the extent that *Gonzalez* held that the reasonableness of the traffic stop must–in addition to its duration–be judged by whether the officer's conduct altered the fundamental nature of the stop. *Harris*, 228 Ill. 2d at 244. It is clear, however, that *Harris* preserves the duration prong as the focus of the *Terry* scope inquiry.

search: "statements given during a period of illegal detention are inadmissible, even though voluntarily given, if they are the product of the illegal detention and not the result of an independent act of free will." *Florida v. Royer*, 460 U.S. 491, 501, 75 L. Ed. 2d 228, 238-39, 103 S. Ct. 1319, 1326 (1983) (plurality op.); see also *Bostick*, 501 U.S. at 433-34, 115 L. Ed. 2d at 398, 111 S. Ct. at 2386 (if consent was given during the course of an unlawful seizure, the results of the search must be suppressed as tainted fruit).

## B. Application to the Cases at Bar

In its opinion, the majority's analysis as to both Cosby and Mendoza centers exclusively upon the four *Mendenhall* factors. The court holds that none of the four factors are present in either of defendants' cases and summarily concludes that defendants were not seized at the time they were asked for consent to submit to a search. However, as I have just noted, not only has the United States Supreme Court in *Brendlin* reaffirmed that a court must assess "all of the circumstances surrounding the incident" to determine whether an individual is seized, but this court has also recently and unanimously held in *Luedemann* that the *Mendenhall* factors are *not* exhaustive in determining whether a defendant is seized for purposes of the fourth amendment. It is only in response to the concerns raised in this separate opinion that the majority acknowledges that *Luedemann* held that the *Mendenhall* factors are not exhaustive and that a seizure can be found on the basis of other coercive police behavior that is similar to the *Mendenhall* factors. Slip op. at 14-15. Nevertheless, the majority states that the "additional factors" noted in *Luedemann* "only apply to situations where police approach a parked vehicle" and that "[t]he fact that Cosby's car was parked on the side of the road after Kaus effected a traffic stop does not make the additional factors applicable." Slip op. at 14. I disagree. *Luedemann* determined that the analytical framework for assessing whether an individual is "seized" within the meaning of the fourth amendment differs depending upon whether that person is walking down the street as a pedestrian or whether his "freedom of movement is restrained by some factor independent of police conduct." *Luedemann*, 222 Ill. 2d at 550. In the former instance, the correct test is to determine whether, in view of all the circumstances, a reasonable person would feel "free to leave."

*Luedemann*, 222 Ill. 2d at 550. However, in the latter instance–*i.e.*, where a person's movement is restrained by a factor independent of police conduct such as here, where a person encounters a law enforcement officer while the person is seated in a car–the "free to leave" test is inappropriate. Rather, the " 'appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.' " *Luedemann*, 222 Ill. 2d at 550, quoting *Bostick*, 501 U.S. at 436, 115 L. Ed. 2d at 400, 111 S. Ct. at 2387 (applying standard to persons seated on a bus boarded by law enforcement officers). It is in distinguishing an encounter between officers and a pedestrian as opposed to an encounter between officers and a person seated in a car that *Luedemann* underscored that different analytical questions are presented. Where the latter factual situation is presented, *Luedemann* cited with approval Professor LaFave's four examples–in addition to the *Mendenhall* factors–as part of the analysis in determining whether a particular defendant was seized. Despite the fact that it is apparent that the *Luedemann* analysis applies to the facts in the matter at bar because defendant encountered the police not as a pedestrian but rather under circumstances wherein his "freedom of movement [was] restrained by some factor independent of police conduct"–namely, that he was seated in his car–the majority now states that the analysis in *Luedemann* is not applicable to Cosby's case. The majority reasons that even though Cosby was seated in his car at the time of the encounter, his car was parked on the side of the road as a result of a traffic stop, rather than being approached by police when he was already parked. This narrow reading of *Luedemann* is unsupportable. Contrary to the United States Supreme Court's decision in *Brendlin* and our recent pronouncement in *Luedemann*, the majority's opinion today leaves the clear–albeit incorrect–impression that the *Mendenhall* factors are the exhaustive factors for determining whether a person is seized within the meaning of the fourth amendment. I am concerned that the majority's analysis unnecessarily calls into question the continued viability of our analysis in *Luedemann*, a unanimous decision that is less than two years old.

The majority compounds its analytical errors by rejecting Cosby's assertion that his traffic stop violated the scope prong of *Terry* based upon its unreasonable duration. The majority notes that Cosby

maintains that Officer Kaus improperly treated the request to search defendant's vehicle as if it were part of the traffic stop, because, in Cosby's words, Kaus asked for consent to search "in the same breath" as he explained the warning and returned his paperwork to him, and that this unreasonably prolonged Cosby's detention. The majority summarily rejects Cosby's assertion, stating that "the record does not support such an argument." Slip op. at 10. I strongly disagree.

The record reflects that defendant Cosby was stopped because he had a burned-out rear registration light. Officer Kaus wrote defendant a warning citation for this minor infraction and had no reasonable suspicion that defendant was involved in any other criminal activity. Nevertheless, Kaus radioed for a backup unit to come to the scene of the stop and waited for Officer Klima to arrive before Kaus returned to defendant's vehicle to ask for defendant's consent to search his vehicle. Defendant was not only asked for his consent immediately after a second police vehicle arrived at the scene and pulled up behind Kaus' squad car, which had its flashing emergency lights and spotlight activated throughout the entire encounter,[4] but also after the presence of a second officer at the scene was established, and while Kaus was in the course of returning defendant's paperwork and explaining the warning citation. Contrary to the majority's holding, the record amply supports defendant's argument that although the justification for the initially lawful traffic stop had concluded, the seizure of defendant nevertheless continued–and, in fact, escalated through an increased show of authority by virtue of the appearance of a second police officer and vehicle[5]–at the time Kaus asked defendant

---

[4]I note that the use of flashing lights as a show of authority is one factor specifically set forth in *Luedemann* that is indicative of a seizure. *Luedemann*, 222 Ill. 2d at 557.

[5]Although the majority attempts to minimize the presence of Officer Klima at the scene of the stop by noting that Officer Kaus testified that Klima usually "handled the tow duties and such," it is well settled that it is an officer's objective conduct–and not his subjective intentions–that is relevant to determining whether seizure has occurred. *People v. Smith*, 214 Ill. 2d 338, 355 (2005), citing *Michigan v. Chesternut*, 486 U.S. 567, 575 n.7, 100 L. Ed. 2d 565, 573 n.7, 108 S. Ct. 1975, 1980 n.7 (1988). Here, it is undisputed that Klima arrived at the scene of the traffic stop prior to

to agree to allow a search of his car absent any reasonable or articulable suspicion for continuing the seizure. Indeed, the prosecutor's own stipulation during Cosby's suppression hearing that "the officer asked for consent and got the consent almost immediately as he is handing the citation to the defendant," combined with Kaus' testimony at trial, confirms that the request for defendant to allow a vehicle search was made while defendant was seized as a result of the traffic stop by the two officers.

It is well settled that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500, 75 L. Ed. 2d at 238, 103 S. Ct. at 1325 (plurality op.); *Brownlee*, 186 Ill. 2d at 519. It is against this background that I observe that Kaus candidly testified that his intent to ask defendant to "consent" to a vehicle search was formulated prior to his returning defendant's documents and motivated him to call for a backup unit–a series of events which Kaus testified caused him to wait in his car for a period of approximately five minutes until Officer Klima arrived at the scene. This period of time–coupled with the additional few minutes Kaus testified it took him to check defendant's documents and prepare the warning–meant that defendant was detained for nearly 10 minutes to receive a warning for a burned-out rear registration light. I note that it is the State which "bears the burden of showing that a seizure based on reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Royer*, 460 U.S. at 500, 75 L. Ed. 2d at 238, 103 S. Ct. at 1326 (plurality op.); *Brownlee*, 186 Ill. 2d at 519. In Cosby's case, the conclusion is inescapable that he remained seized as a result of the traffic stop at the time of the search request, even though the justification for that stop had concluded. The continued detention was of unreasonable duration, as the officers lacked reasonable suspicion of any illegal activities on the part of defendant to continue to detain him. As

Kaus' reapproaching Cosby's vehicle to ask him for a consent search, and that Klima was present with defendant at the rear passenger area of defendant's car immediately after Kaus obtained Cosby's consent. It is this objective conduct–and not any alleged subjective intentions uncommunicated to defendant–which is relevant to the analysis.

*Caballes* makes crystal clear, a seizure that is lawful at its inception–*i.e.*, here, the valid traffic stop–can nevertheless violate the fourth amendment "if the *manner of execution* unreasonably infringes interests protected by the constitution," *i.e.*, if the seizure "is prolonged beyond the time reasonably required to complete that mission." (Emphasis added.) *Caballes*, 543 U.S. at 407, 160 L. Ed. 2d at 846, 125 S. Ct. at 837. Under the facts presented, a reasonable person in Cosby's position would not believe that the investigative stop had been concluded and that he was free to terminate the encounter, so long as additional police presence was called to the scene and Officer Kaus was continuing to ask investigative questions while returning defendant's paperwork and warning citation for the original stop. Thus, contrary to the holding of the majority, the record clearly establishes that the continued detention of Cosby was of an unreasonable duration and constituted an illegal seizure.

The majority, however, finds that because Kaus returned Cosby's paperwork to him, this automatically signaled that the traffic stop "came to an end," and, therefore, the "relevant" question is whether the actions of the officers after the conclusion of the initial stop constituted a new, second seizure of defendant for purposes of the fourth amendment. Slip op. at 10-11. First, as explained, I disagree with the majority's summary finding that the traffic stop had concluded when the request to search defendant's vehicle was made. Indeed, I note that the majority contradicts itself on this point within its opinion when, after stating–as noted above–that the traffic stop had come to an end prior to Officer Kaus' request to defendant to allow a search of his vehicle, it subsequently states that after Kaus returned defendant's paperwork, "[t]here is no indication in the record that Kaus waited for any particular period before asking for consent." Slip op. at 19. Second, assuming *arguendo* that the traffic stop had concluded, the majority still errs by holding that defendant was not subject to a second seizure under the circumstances presented.

As stated, the majority improperly treats the *Mendenhall* factors as the exhaustive inquiry in determining whether a seizure has occurred. I further note that in discussing these factors, the court unduly narrows their application by interpreting them in an overly technical manner. For example, the majority notes that one factor to consider under *Mendenhall* is the presence of "several" officers and

states that "[i]t is clear \*\*\* that the presence of only two officers, without more, is not a factor that would indicate a seizure occurred." Slip op. at 12. I question whether the majority has now adopted a bright-line rule which stands for the proposition that under *any* circumstances the presence of two officers will *never* be considered to have a coercive effect, despite our prior case law which has found that defendants have been seized under the totality of all the circumstances in instances where the encounter involved only one or two officers, and not more. See, *e.g.*, *Bunch*, 207 Ill. 2d at 19-20 (defendant found to be "seized" during a traffic stop where defendant had an encounter with one police officer); *People v. Gherna*, 203 Ill. 2d 165, 180-81 (2003) (defendant found to be "seized" during a traffic stop when approached by two officers); *Brownlee*, 186 Ill. 2d at 520-21 (same).

It is my view that this court's decisions in *Bunch* and *Brownlee* are factually analogous to Cosby's case, support his contention that his suppression motion should have been granted, and that the majority's attempt to distinguish these cases is unpersuasive. For example, in *Bunch*, this court found that the officer's continued questioning of the defendant after the purpose of the traffic stop had been concluded "prolonged defendant's detention beyond the completion of the purpose of the stop." *Bunch*, 207 Ill. 2d at 17. Since the officer's conduct in *Bunch* occurred after the justification for the traffic stop ended, this court looked to whether the officer's questioning of the defendant was related to the traffic stop or supported by a separate, reasonable, articulable suspicion of criminal conduct. Finding none, the court concluded that defendant had been unreasonably seized by the officer.[6] This is similar to the facts in the matter at bar, where defendant's detention was unduly prolonged to allow the arrival of a backup officer at the scene which escalated the show of authority absent any reasonable basis, and where Kaus continued to question defendant after the purpose of the traffic stop had been concluded.

---

[6]I note that the continued validity of our decision in *Bunch* was reaffirmed in *Harris*. See *Harris*, 228 Ill. 2d at 244 n.3.

Similarly, in *Brownlee*, this court held that the defendant was unlawfully seized after the justification for the traffic stop had ended, where the two officers continued to flank both sides of the vehicle after returning the motorist's documents and stating that no citations would be issued, paused for a "couple of minutes," and then requested that the occupants agree to a consent search. We held that under those circumstances, "the officers' actions constituted a show of authority," and that a reasonable person "would likely conclude that, if he or she drove away, then the two officers would soon be in hot pursuit." *Brownlee*, 186 Ill. 2d at 520. The majority attempts to distinguish *Brownlee* on the basis that unlike the couple-minute delay occasioned by the officers in that case, here there "is no indication in the record that Kaus waited for any particular period of time before asking for consent" from Cosby. Slip op. at 19. As noted, however, this statement contradicts the position taken by the majority earlier in its opinion, wherein it finds that there was a break between the conclusion of the traffic stop and Kaus' request to Cosby to allow a search, and rejects precisely the same argument it now embraces, writing: "While Cosby argues before this court that there was no break between the conclusion of the traffic stop and the officer's request for consent to search, we conclude that the record does not support such an argument." Slip op. at 10. I submit that the majority cannot have it both ways.

Of course, questioning by law enforcement officers does not alone effectuate a seizure. However, if the circumstances surrounding the questioning "are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded," such questioning can result in a detention under the fourth amendment. *Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 216, 80 L. Ed. 2d 247, 255, 104 S. Ct. 1758, 1762 (1984); see also *Bunch*, 207 Ill. 2d at 19-20; *Brownlee*, 186 Ill. 2d at 520-21. In my view, a reasonable person in the position of Cosby would not have believed he was free to terminate the encounter and drive away: Cosby was stopped in the early morning hours on a poorly lit and seldom traveled road; he was forced to wait an extended period until a backup officer arrived at the scene; two police cars with at least one having flashing emergency lights and an illuminated spotlight were parked behind his car; he was in the

-35-

presence of two officers, with one having been called to the scene during the stop, which escalated the show of authority; he was asked to agree to a search of his vehicle as he was being handed back his documents and informed about the warning; and at no point was he told he was free to leave.[7] Under the totality of the circumstances, a reasonable person would not feel free to terminate the encounter and go about his business. In sum, Cosby was seized. See *Bunch*, 207 Ill. 2d at 19-20; *Brownlee*, 186 Ill. 2d at 520-21. The seizure was unreasonable because the officers had no reasonable or articulable suspicion that Cosby was engaged in wrongdoing. Accordingly, Cosby's subsequent "consent" to the search of his vehicle and his person was the product of an unlawful detention. In turn, Cosby's arrest was tainted, and the fruits of the encounter should have been suppressed. The majority's holding to the contrary merely pays lip service to the applicable analytical principles, and, by doing so, renders them meaningless.

I note two final points with respect to defendant Cosby's case. As stated earlier, the majority opinion completely omits a number of key background facts with respect to Cosby's case in order to reach its desired legal conclusion. The majority opinion omits from its "Background" that Kaus testified that he stopped defendant on a two-lane road with little or no traffic and poor lighting conditions with no overhead lights. Kaus' testimony indicates that he had his squad car's overhead emergency lights and spotlight activated for the duration of the stop. Kaus also testified that it was his custom to remain in his squad car until the backup officer arrived. After the backup officer–Officer Klima–arrived at the scene, he pulled his car behind Kaus' vehicle. Kaus testified that it was only then that he reapproached defendant, asked him to consent to search his car, and asked defendant to get out of the car and stand at the rear passenger side of the vehicle. Kaus further testified that when defendant stood

---

[7]Although the majority notes that it is not constitutionally required to tell a motorist that he or she is free to leave before asking for consent to search the motorist's car, knowledge of the right to refuse to consent is one factor to be taken into account in assessing the totality of the circumstances. *Robinette*, 519 U.S. at 39, 136 L. Ed. 2d at 355, 117 S. Ct. at 421.

at the rear passenger side of his car, defendant was in the presence of Officer Klima and was speaking with him.

Based upon Kaus' testimony, at the time that Kaus reapproached Cosby's car, asked for a consent search, and directed Cosby out of his vehicle, it is apparent that Officer Klima was not only present at the scene, but that he was also standing outside of his own police vehicle at the passenger side of defendant's car. It is my view that the only fair and reasonable inference which can be drawn from Officer Kaus' testimony is that both officers had exited their cars and approached defendant's vehicle, with one on each side of his car during this period. It is also fair and reasonable to draw an inference from Kaus' testimony that he called for a backup unit and deliberately remained in his vehicle until Klima arrived for the purpose of having an additional officer at the scene of the stop–and an increased show of authority–at the time he planned to ask defendant for consent to search. It is also a fair and reasonable inference that the backup officer arrived at the scene in a police squad car and that the police vehicles would have had their lights activated; indeed, a contrary inference would seem unreasonable. I note that the trial court set forth no factual findings to dispute these reasonable inferences. I have evaluated the facts of record, and, after considering those facts against our own precedent (*i.e.*, *Luedemann*) and that of the United States Supreme Court (*i.e.*, *Brendlin*, *Mendenhall*), have reached a legal conclusion that is contrary to that of the majority.

Second, I note that although Cosby was pulled over for a minor traffic violation and issued a warning citation, Officer Kaus freely admitted that he formulated an intent to ask Cosby for a consent search prior to returning his documents to him. I am troubled by the specter of routine traffic stops being regularly transformed into so-called "consensual" contraband searches where there is no reasonable or articulable basis to suspect criminal wrongdoing. The fourth amendment exists to protect citizens against such an unreasonable interference with their liberty. The majority's holding with respect to defendant Cosby stands for the proposition that, following the conclusion of a lawful traffic stop, officers may detain a vehicle absent reasonable suspicion of any illegal activity and for any amount of time, so long as they ultimately request and obtain "voluntary

consent" to search the car. As I cannot countenance such a rule, I dissent in part from the opinion of the majority.

The unreasonableness of the police conduct in Cosby's case is highlighted by the factual differences between his case and that of defendant Mendoza. As stated, I disagree with the majority's exclusive use of the *Mendenhall* factors in deciding defendant's constitutional challenge. However, viewing the totality of the circumstances presented, there is a significant difference in the extent of the coercive effect of the police conduct as a whole between the cases of Cosby and Mendoza. Unlike in the case of Cosby, the facts indicate that for Mendoza the traffic stop had come to an end at the time that he was asked to consent to a search of his vehicle. In addition, the record reflects that the additional questions and answers took less than 30 seconds. Under these circumstances, Mendoza exercised his right to refuse the request of the officers, to terminate the encounter, and to go about his business and drive away. The officers happened to be in a place where they lawfully had a right to be, during this consensual encounter, where they then observed in plain view what appeared to be a handgun in Mendoza's vehicle. The officers, seeing the gun in plain view, at that point had probable cause to detain defendant for violation of the offense for which he was charged and ultimately convicted: aggravated unlawful use of a weapon (720 ILCS 5/24–1.6(a)(1), (a)(3)(A) (West 2002)). See *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 29 L. Ed. 2d 564, 582, 91 S. Ct. 2022, 2037 (1971) (under certain circumstances the police may seize evidence in plain view without a warrant). Because Mendoza was not seized at the time the officers questioned him and observed the presence of the gun in his car, his suppression motion should not have been granted.

JUSTICES KILBRIDE and BURKE join in this partial concurrence and partial dissent.