2020 IL App (1st) 180037-U
No. 1-18-0037

SECOND DIVISION
September 30, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 13 CR 12813 |
| | ) | 13 CR 15110 |
| CHRISTOPHER CAMPBELL, | ) | |
| | ) | |
| Defendant-Appellant. | ) | The Honorable |
| | ) | Dennis J. Porter, |
| | | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1     *Held:*  Where the State's statements during closing arguments were proper comments on the evidence presented at trial and the negative effects of defendant's crime and did not improperly bolster the credibility of police officer witnesses, they did not constitute error. Although the State's comment on defendant's prior conviction suggested a propensity to commit crime, any error was cured by the trial court's instructions to the jury.  Finally, the trial court did not abuse its discretion in denying, following an *in camera* review, defendant's request for the production of police investigation reports in an unrelated murder investigation.

¶ 2     Defendant, Christopher Campbell, appeals from his convictions for possession of a

controlled substance (720 ILCS 570/402(c) (West 2012)) (case number 13 CR 12813) and

delivery of a controlled substance (720 ILCS 570/401(d)(1) (West 2012)) (case number 13 CR 15110). On appeal, defendant argues that he was prejudiced by improper statements made by the State during closing arguments. He also asks that we review the trial court's determination, following an *in camera* inspection, that police reports from an unrelated murder investigation were not relevant and, thus, did not need to be produced. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4        Following a controlled drug buy by police, defendant was charged with two counts of delivery of a controlled substance (720 ILCS 570/401(d) (West 2012); *id.* § 407(b)(2) (West 2012)) in case number 13 CR 15110, and one count of possession of a controlled substance with the intent to deliver (*id.* § 401(c)(1) (West 2012)) in case number 13 CR 12813. The two cases were consolidated prior to trial.

¶ 5        During pretrial proceedings, defendant filed a supplemental motion for discovery. In that motion, defendant requested that the State produce any police reports, notes, memoranda, or statements related to the murder investigation in case number 14 CR 21343, *State v. Devonshe Collier* ("Collier investigation"), in which defendant was a State witness. At a hearing on the motion, defense counsel argued that because defendant was arrested and questioned as a person of interest in 2014 in the Collier investigation, while the instant charges were pending, counsel believed that defendant's arrest and prosecution in the instant case might have been at the request of the detectives in the Collier investigation. In other words, defense counsel argued, the detectives in the Collier investigation requested that the drug buy be made for the purpose of gathering information from defendant regarding the Collier investigation. At the very least, defense counsel requested that the trial court conduct an *in camera* inspection of the Collier investigation reports, notes, statements, etc.

¶ 6       The State argued in response that it was unreasonable to believe that the drug buy was performed at the request of the Collier investigation detectives, given that defendant was not ultimately interviewed in connection with the murder investigation until a year after the instant charges were filed.  In addition, the State argued that defendant did not become a person of interest in the Collier investigation until another citizen identified him *after* the instant charges had already been filed.

¶ 7       The trial court agreed to conduct an *in camera* inspection of the produced police reports from the Collier investigation.  At a status hearing following the trial court's review of the reports, defense counsel again explained that she requested the reports because she believed that defendant might have been targeted in the drug buy to allow the Collier detectives to gather information for the Collier investigation.  The trial court stated that the disclosed reports did not indicate this claim in "any way, shape, or form," and that there were no documents in which the drug buy was requested as a part of the Collier investigation.  The trial court did say, however, that in one of the reports was a summary of defendant's statement to police regarding the murder underlying the Collier investigation.  Ultimately, the trial court denied defendant's request that the Collier investigation documents be turned over to him.

¶ 8       Defendant was tried in front of a jury in June 2017.  First to testify at trial was Officer Defonda Louie of the Chicago Police Department ("CPD").  He testified that he had been with CPD for 24 years and was currently assigned to the Organized Crime Division, Narcotics Section, where he investigated narcotics activity in the Chicagoland area.  On the afternoon of June 7, 2013, Louie was involved in an undercover drug buy in the area of 71st Street and State Street.  Also working with Louie on that buy were Officer Marvin Randolph, working undercover and surveillance in the car with Louie; Officer Edward Daniels, surveillance; Officer

Nelson Gonzalez, surveillance; Officer Brian Gunnell, enforcement; and Officer Ricky Sanchez, enforcement. Gunnell had given Louie prerecorded funds to use during the buy—one 10-dollar bill and one 20-dollar bill. Louie was dressed in civilian clothes that day and rode in an unmarked vehicle with Randolph.

¶ 9        That afternoon, Louie and Randolph went to the area of 71st and State Street in the unmarked vehicle where there was a known open-air drug market. Louie drove the vehicle, while Randolph rode as the passenger. At the time, they were not looking for anyone in particular. When they arrived at 71st and State Street, Louie observed Robert Lawson, who Louie had been in contact with on previous occasions. Upon seeing Lawson, Louie pulled his vehicle over, and he and Randolph exited the vehicle and approached Lawson. Louie told Lawson that he wanted to purchase "blows," which is the street term for white heroin. Lawson told Louie, "Come on," and the officers and Lawson returned to the vehicle and got inside. There, Lawson made a phone call. Lawson placed the call on speaker, and Louie heard a man answer. Louie did not recognize the man's voice. Lawson told the man that he wanted to purchase "duces," another street term for heroin. The man told Lawson to meet him in the area of 75th and Wabash.

¶ 10        Louie, Randolph, and Lawson then drove to the designated area, and Louie stopped the vehicle facing southbound at approximately 7520 South Wabash. Lawson called the man again and informed him of their location. A few minutes later, a black Monte Carlo turned southbound onto Wabash towards Louie's vehicle. The Monte Carlo pulled up alongside Louie's vehicle and stopped. Sitting in the passenger seat of the Monte Carlo, right next to Louie's driver's side, was defendant. Defendant asked Louie how many he wanted, and Louie answered that he wanted two. Defendant handed Louie two tinfoil items, each containing a white powder that Louie

suspected to be white heroin. In return, Louie gave defendant the prerecorded bills that he had received from Gunnell. Thereafter, defendant left in the black Monte Carlo, and Louie dropped Lawson back in the area of 71st and State Street. After dropping off Lawson, Louie radioed his other team members that there had been a positive narcotics transaction. During this time, surveillance officers had been following the Monte Carlo and enforcement officers pulled it over. Louie proceeded to 236 West 76th Street, where the Monte Carlo had been stopped. Defendant was standing outside the vehicle, and Louie positively identified him as the same person who had sold Louie drugs at 75th and Wabash. Approximately 10 to 15 minutes had elapsed between the time Louie purchased the heroin and the time that Louie went to identify defendant.

¶ 11       Louie denied having had any contact with defendant prior to June 7, 2013, and denied that defendant was the target of the buy that day.

¶ 12       On cross-examination, Louie admitted that his report of the incident did not accurately represent the serial numbers of the prerecorded funds that he used in the buy. More specifically, for one of the serial numbers, he inadvertently listed it as a 20-dollar bill when he meant to list it as the 10-dollar bill he used. The other serial number—which he recorded as for the 10-dollar bill but should have been the one for the 20-dollar bill he used—was incorrect because he accidentally recorded the serial number for a different bill that was listed just above the serial number for his bill on the prerecorded funds sheet.

¶ 13       Jamie Hess, a forensic scientist with the Forensic Science Center at Chicago at the time of trial, testified that on June 17, 2013, she was employed with the Illinois State Police. On that date, she received two tinfoil packets containing white powder for analysis. The powder within the packets weighed .5 grams and tested positive for the presence of heroin.

¶ 14    Officer Marvin Randolph, an 18-year veteran with CPD, testified next.  On June 7, 2013, he was assigned to the Narcotics Division.  On that day, he was working as an undercover/surveillance officer with Louie.  Working with them were Officers Daniels, Gonzalez, and Gunnell as surveillance and Officers Konoir and Sanchez as enforcement.  On that afternoon, he and Louie drove to the area of 71st and State Street.  They were riding in an unmarked vehicle, and Louie was driving.  They were not looking to buy from anyone specific that day.  When they arrived at the area of 71st and State Street, the officers approached Lawson, with whom Louie had done previous buys.  Louie had a brief conversation with Lawson, but Randolph did not hear what was said.  After Louie and Lawson conversed, all three returned to the officers' vehicle.  Louie resumed the driver's position, while Lawson sat in the front passenger seat and Randolph sat in the back on the passenger's side.  In the car, Lawson placed a phone call over speaker.  Lawson told the man on the phone that he wanted two "duces."  The man on the phone told Lawson to meet him in the 7500 block of Wabash.  Randolph did not recognize the man's voice.

¶ 15    The officers and Lawson proceeded to the 7500 block of Wabash and stopped at approximately 7520 South Wabash, facing south.  Lawson then made a second phone call and told the person on the phone where they had parked.  About five minutes later, a black Monte Carlo pulled up alongside the officers' vehicle, with the passenger's side of the Monte Carlo no more than two feet from the driver's side of the officers' vehicle.  Defendant sat in the front passenger seat of the Monte Carlo.  Defendant reached into the officers' vehicle and handed Louie an unknown object.  Louie than handed defendant some currency—a 20-dollar bill and a 10-dollar bill. Randolph could not hear any words exchanged between defendant and Louie.

¶ 16 After the transaction with defendant, the officers and Lawson returned to the area of 71st and State Street to drop off Lawson where they picked him up. After dropping off Lawson, Louie radioed to the other team members that there had been a positive buy and informed the team of the last known location of the Monte Carlo. About 10 minutes after the buy, Randolph learned that the enforcement officers had stopped the Monte Carlo. Louie and Randolph proceeded to 236 West 76th Street where the stop occurred. There, Randolph saw defendant standing outside the Monte Carlo. Louie radioed to the other team members confirmation that defendant was the individual with whom he had engaged in the transaction.

¶ 17 Randolph and Louie then returned to their station where Randolph inventoried the two tinfoil packets that Louie received from defendant and the prerecorded funds—the $20 and $10 bills—which Gunnell had given him to inventory.

¶ 18 Randolph denied ever meeting defendant prior to the date of the buy.

¶ 19 On cross-examination, Randolph admitted that he had made a typo in his report when he recorded that $40—two $20 bills—instead $30, had been used in the buy and inventoried. In contrast, the inventory sheet for the prerecorded funds correctly indicated that a $20 bill and a $10 bill were inventoried. Randolph also acknowledged that one of the serial numbers for the prerecorded funds that he recorded in his report did not match one of the serial numbers he recorded on the inventory sheet. He testified that the serial numbers and denominations listed on the inventory sheet were the correct ones, because he was recording them directly from the bills as they were in front of him. In contrast, he did not have the bills in front of him while he was drafting his report. He also admitted to recording in his report the location of the buy as 7820 South Wabash, instead of 7520 South Wabash. Finally, he acknowledged that although

Gunnell's name should have been on the inventory sheet for the recovered narcotics as the case officer, it was mistakenly put in the box as the officer who found the narcotics.

¶ 20    Sergeant Brian Gunnell of CPD testified that on June 7, 2013, he was working with the Narcotics Division and was not a sergeant at the time. That day he was working as a surveillance officer on a team with Officers Louie, Randolph, Gonzalez, and Konior. As a surveillance officer, his job was to watch the undercover officers. The team first went to the area of 71st and State Street. There, Gunnell observed an officer approach Lawson and converse with him. When the undercover team relocated to 75th and Wabash, Gunnell did not have a view of them, so he did not observe the transaction between Louie and defendant. He was, however, keeping up with the events over the radio with his team. At some point, he learned that defendant had been arrested, and he was directed to go back to the station.

¶ 21    Once back to the station, Sanchez handed Gunnell a large bundle of money so that Gunnell could see if the prerecorded funds were in it. To do this, Gunnell compared the serial numbers of the bills given to him by Sanchez with the serial numbers that were listed on his inventory of prerecorded funds. According to Gunnell, on the day of the buy, he took out $240 in $10 and $20 bills from the CPD bursar. He then recorded each bill's denomination and serial number on his prerecorded funds sheet. After comparing the serial numbers of the bills in the bundle with the serial numbers of the bills on his prerecorded funds sheet, Gunnell found two bills—a $10 bill and a $20 bill—in the bundle that had serial numbers that matched bills recorded on his prerecorded funds sheet. Gunnell then gave that $10 bill and $20 bill to Randolph to be inventoried. In addition to the $30 in prerecorded funds, $1,852 was recovered from defendant.

¶ 22    Gunnell did not make a report about the incident that day.

¶ 23       Sergeant Nelson Gonzalez of CPD testified that on June 7, 2013, he was not yet a sergeant, but was assigned to the Narcotics Division. That day, he was working as a surveillance officer on the team. From a gas station on the corner of 71st and State Street, Gonzalez observed Louie and Randolph approach Lawson, engage in a conversation with him, and then walk out of his view.

¶ 24       Thereafter, he relocated to the area of 7520 South Wabash and parked a few car lengths behind the undercover vehicle of Louie and Randolph. While parked there, he observed the black Monte Carlo with defendant in the passenger seat drive southbound and pull alongside Louie's vehicle. There was then some sort of interactions between defendant and Louie that were indicative of a hand-to-hand transaction, like each was reaching into the other vehicle. Gonzalez could not, however, see what was being exchanged. The black Monte Carlo then drove away, and Gonzalez followed it.

¶ 25       Gonzalez followed the Monte Carlo through the neighborhood until it turned back southbound onto Wabash again. It then pulled over to the side of the street, where an unidentified male was waiting. Once the Monte Carlo came to a stop, the man took a couple of steps towards the car and handed some money to defendant. Defendant then handed the man some items, which the man held in a clenched fist, put in his pocket, and walked away. Gonzalez believed he had just observed a hand-to-hand narcotics transaction. Gonzalez radioed this information to the team and continued to follow the Monte Carlo, never losing sight of it. Approximately five minutes later, the enforcement officers stopped the Monte Carlo. Gonzalez drove by the vehicle after it had been stopped and confirmed that defendant was the individual he had seen engage in the described hand-to-hand transactions.

¶ 26　　On cross-examination, Gonzalez acknowledged that the report he wrote following the events of the day did not include anything about the interaction he observed between defendant and Louie. He also did not mention any prerecorded funds being recovered from defendant, and he listed Louie as a surveillance officer.

¶ 27　　Gonzalez explained on redirect, however, that he did not document the transaction between defendant and Louie in his report because other officers with better viewpoints had already documented the interaction in great detail in other reports.

¶ 28　　Officer Richard Sanchez testified that on June 7, 2013, he was working as an enforcement officer on the team for the undercover buy at issue. As an enforcement officer, his job was to stop the individuals who needed to be arrested in a buy.

¶ 29　　On the day at issue, although he did not go to the locations where Louie and Randolph met Lawson and where Louie interacted with defendant, he was parked a few blocks away and in constant radio contact with the team. Through radio contact, Sanchez was eventually directed to the area of 236 West 76th, where Gonzalez advised that the black Monte Carlo was traveling westbound. Upon encountering the vehicle, Sanchez and Konior activated their vehicle's lights and stopped the Monte Carlo. At that time, the purpose of stopping and approaching the vehicle was just to identify the passenger, *i.e.*, to find out his name, date of birth, and address. When Sanchez approached the passenger side of the Monte Carlo, he saw defendant sitting in the passenger's seat. Sanchez also observed a clear plastic baggy containing tinfoil in the cup holder. He and Konior then asked defendant and the driver to exit the vehicle, which they did. After the occupants were removed from the vehicle, Sanchez retrieved the baggy from the cupholder and saw that it contained 18 tinfoil packets. Based on his experience in narcotics investigations, Sanchez believed the tinfoil packets to contain heroin.

¶ 30    Because of the discovery of the suspected heroin in the Monte Carlo, the decision was made to place defendant under arrest at that time for the possession of the packets in the cup holder. In the process of placing defendant under arrest, Sanchez patted defendant down and discovered multiple bundles of money in his jacket pockets. Once back at the station, he gave the money to Gunnell for comparison to the prerecorded funds sheet. Before doing so, however, he straightened the money out into a single stack of bills. After Gunnell reviewed the bills, he returned it to Sanchez. Sanchez then counted it and inventoried it. The money totaled $1,852. He also inventoried the 18 tinfoil packets he recovered from the Monte Carlo. He observed that the tinfoil packets that Louie received from defendant were packaged the same way as the 18 packets he recovered from the Monte Carlo.

¶ 31    Julia Edwards, a forensic chemist with the Illinois State Police, testified that on June 11, 2013, she received 18 tinfoil packets containing powder for analysis. The weight of the powder from 11 of those packets was 3.1 grams. In addition, the powder from those 11 packets tested positive for the presence of heroin.

¶ 32    The State then rested, and defendant began the presentation of his case by calling Nikita Thompson, defendant's aunt, to testify next. In June 2013, she lived with defendant, her sister (defendant's mother), and her daughter in Chicago. Defendant worked as a healthcare aide at the time. On the morning of June 7, 2013, she, defendant, defendant's mother, and Thompson's mother were preparing her home for a party to send her daughter off to prom. That morning, she asked defendant to go buy supplies for the party. She gave defendant $450, defendant's mother gave him $450, and Thompson's mother (defendant's grandmother) gave him $350, all in cash. Of the money she gave defendant, $150 was to be used to purchase party supplies, and the rest was for his birthday, which was May 20. Similarly, of the $450 that defendant's mother gave

him, $150 was to be used to purchase party supplies, and the rest was for his birthday. The money defendant's grandmother gave him was all for his birthday, specifically to be used to get his driver's license reinstated. Defendant told Thompson that an acquaintance was going to give him a ride to Ford City Mall to get the party supplies. Defendant left the house between 11:30 a.m. and 12:00 p.m. that day but never returned. She later learned that defendant had been arrested.

¶ 33        Finally, defendant testified. On June 7, 2013, he lived with his aunt, Nikita Thompson, his mom, and his cousin. That morning, he was helping with preparations for his cousin's prom party. His mother, aunt, and grandmother asked him to go purchase supplies for the party and gave him money. He could not recall the amount of money each of them gave to him, but some of the money given to him by his mom and his aunt was to purchase supplies and some of it was for his birthday. The money given to him by his grandmother was just for his birthday to get his driver's license. After receiving that money, he put it in his pants and jacket pockets. He also had money on him that day from having cashed his paycheck from his job as a home health care provider a couple days earlier.

¶ 34        Defendant called his friend Antoine Bradley and asked for a ride to Ford City Mall. Bradley agreed and picked defendant up from his home. Bradley told defendant that before going to the mall, he needed to make a stop on Wabash. Bradley drove to 75th and Wabash and stopped the vehicle. A man approached the passenger's side of the vehicle where defendant was sitting. Bradley and the man conversed briefly, and Bradley reached over defendant and handed the man something. Defendant could not tell what it was that Bradley handed to the man. Defendant and Bradley then drove away.

¶ 35    After driving approximately four or five blocks, the police pulled over Bradley and defendant on 76ᵗʰ Street. Two officers approached the vehicle and spoke with Bradley, after which they asked both Bradley and defendant to exit the vehicle and stand at the back of the car. Defendant and Bradley complied. During the stop, defendant saw one of the officers go into the Monte Carlo and emerge with a sandwich bag containing silver balls. Prior to the officer emerging from the vehicle with the bag, defendant had not seen the bag, touched it, or even known it was there. He denied that it belonged to him. The officer then spoke with Bradley before both men were arrested and transported to the police station. Defendant denied having or selling any heroin that day.

¶ 36    Defendant admitted that in 2011, he was convicted of the felony offense of unlawful use of a weapon by a felon.

¶ 37    On cross-examination, defendant denied that he told officers that he was unemployed. He could not recall how much his paycheck was that he cashed two days before his arrest, but he estimated it to be approximately $600. He had that money on him at the time of his arrest, along with the money he had received from his mom, aunt, and grandmother. Because of how much money he had, he split it into two separate bunches, but both were in the same pants pocket. The man that approached the car on Wabash was neither Louie nor the other man described by Gonzalez. After witnessing Bradley and the man pass something hand-to-hand, defendant did not suspect that a drug transaction had occurred, because he did not see any money exchanged.

¶ 38    The defense rested, and the State called Officer Brian Konior of CPD to testify in rebuttal. On June 7, 2013, he worked as an enforcement officer during the undercover buy at issue. He, with Sanchez, arrested defendant. While processing defendant at the police station, Konior asked defendant if he was employed. Defendant answered that he was unemployed.

¶ 39     In its closing argument, the State argued that the evidence presented at trial, primarily the officers' testimony, proved beyond a reasonable doubt that defendant had committed the charged offenses. The State argued that defendant was "a traveling businessman who works out of his vehicle and his only job, his only business plan is to sell narcotics and poison to the citizens of Chicago." Defendant objected to this comment, but the trial court overruled the objection.

¶ 40     In response, defendant argued in closing that his account was more credible than the officers'. According to defendant, there were so many "cracks" in the State's case that it essentially fell apart. More specifically, defendant pointed out the multiple omissions and errors in the officers' reports, the lack of phone logs or photographs, and the State's failure to call Lawson to testify. Defendant argued that the jury could not "let officers get up here and say what they want and just take it as truth," and that the jury was "deciding what really happened here. And it's not enough for just officers to make all these mistakes and say what they want to say. And what they say on this witness stand doesn't match up with what actually happened and what they actually did when you look at the reports."

¶ 41     The State then argued in rebuttal that defendant's testimony was not credible and that the officers had no motive fabricate their testimony:

> "These officers that testified here today and yesterday, they were doing their job. Their job is to go out on the street in an undercover capacity to find people that are willing to sell them heroin and try to shut it down, shut down what they're doing. They have no motive or bias or reason to come here and tell you what happened and what they saw and how their operation worked except that it happened. That it's the truth. You weigh all of those officers' testimony and there's no bias, no reason to tell you what happened

because that's what happened, against this defendant, who has a felony conviction that proves to you that he's disregarded the law before."

Defendant objected to the State's last statement. The trial court sustained the objection and instructed the jury to disregard the last remark.

¶ 42     Following deliberations, the jury found defendant guilty of possession of a controlled substance and delivery of a controlled substance. Defendant filed a timely motion for new trial, which the trial court denied. On December 12, 2017, the trial court sentenced defendant to 3 years' imprisonment on the possession of a controlled substance count and 7 years' imprisonment on the delivery of a controlled substance count, with the sentences to run concurrently. On the same day, defendant made a motion to reconsider the sentence, which the trial court promptly denied. Defendant then instituted this appeal.

¶ 43                                    ANALYSIS

¶ 44     On appeal, defendant argues that he was prejudiced by the State's improper statements during closing arguments and also asks that we should review the trial court's *in camera* assessment that police reports from the Collier investigation were not relevant to the instant cases. Following a careful review of the record, we conclude that no reversible error occurred with respect to the State's closing arguments and that the trial court did not abuse its discretion in denying defendant's request for the production of the Collier investigation police reports.

¶ 45                              Closing Arguments

¶ 46     Defendant first argues that he is entitled to a new trial because he was substantially prejudiced by certain statements made by the State in its closing arguments. Specifically, defendant argues that the State improperly characterized him as a traveling businessman selling poison to the citizens of Chicago, bolstered the credibility of the police witnesses, and argued

defendant's prior conviction as propensity evidence. We disagree that any of these arguments constitute reversible error.

¶ 47    Generally, prosecutors are afforded wide latitude in making closing arguments. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). They may comment on the evidence presented at trial and the reasonable inferences that may be drawn from such evidence. *People v. Runge*, 234 Ill. 2d 68, 142 (2009). When reviewing a prosecutor's comments, we assess whether "the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *Wheeler*, 226 Ill. 2d at 123.

> "Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in a defendant's conviction. [Citation.] If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted."

*Id.* In making this assessment, we must examine the arguments in their entirety and the comments within the context they are made, without focusing only on selected phrases or remarks. *Runge*, 234 Ill. 2d at 142.

¶ 48    There exists a conflict of authority over the proper standard of review to be applied to claims of improper closing arguments by the State, with some courts reviewing such claims *de novo* and others reviewing them for an abuse of discretion. See, *e.g.*, *Wheeler*, 226 Ill. 2d at 121 ("Whether statements by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*."); *People v. Blue*, 189 Ill. 2d 99, 128 (2000) ("The regulation of the substance and style of closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be

disturbed absent a clear abuse of discretion." (internal quotations omitted)). This Court has, in the past, when necessary to definitively choose one, followed the line of cases applying an abuse-of-discretion standard. See *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 54. In the present case, we conclude that under either standard, the result is the same—a new trial is not warranted.

¶ 49 Defendant first takes issue with the State's characterization of him as a traveling businessman selling poison to the citizens of Chicago. The specific argument to which defendant refers is, in context, as follows:

> "The businessman, just not for your standard business. This business does not have a business name nor a business address with office space. It does not have letterhead. No. *This is a traveling businessman who works out of his vehicle and his only job, his only business plan is to sell narcotics and poison to the citizens of Chicago.*"

(Emphasis added.) According to defendant, the State's purpose in making this statement was to inflame the jury, create an us-versus-them mentality, and generally denounce society's ills. In addition, defendant argues that the reference to "poison" was both irrelevant and unsupported by the evidence.

¶ 50 Defendant is correct that closing arguments must serve some other purpose than to just inflame the jurors' emotions. *Wheeler*, 226 Ill. 2d at 128. A prosecutor also may not use closing arguments to generate an us-versus-them mentality that is inconsistent with the principle that the jury must be nonpartisan. *Id.* at 129. Although a prosecutor may not characterize a defendant as an evil person or focus on the general problem of crime in society or a denunciation of society's ills, a prosecutor is well within the standards of propriety in commenting on the evil effects of a

defendant's specific crime and urging the jury to administer the law without fear. *People v. Deramus*, 2014 IL App (1st) 130995, ¶ 55.

¶ 51    Courts of this state have held on previous occasions that comments like the ones complained of by defendant are permissible comments on the negative effects of the defendant's crimes. See *People v. Herndon*, 2015 IL App (1st) 123375, ¶ 43-45 (State's argument that the victims of the defendant's crime were the people who lived in the vicinity of the narcotics transaction was properly based on the evidence that defendant sold narcotics in a residential neighborhood in broad daylight); *Deramus*, 2014 IL App (1st) 130995, ¶¶ 43-44, 54-56 (State's argument that the defendant was a "businessman" selling "poison" and "ruining that neighborhood" was a permissible comment based on the evidence that the defendant was selling heroin); *People v. Bell*, 343 Ill. App. 3d 110, 115 (2003) (State's argument that the defendant was a businessman whose work selling drugs "destroys our children, our family," and "our lives" was permissible closing argument); *People v. Janis*, 240 Ill. App. 3d 805, 814-15 (1992) (State's arguments that "the narcotics trade is all about greed and easy money and that drugs are a poison killing this country" were not reversible error).

¶ 52    Similarly, we conclude that the State's argument that defendant was a "traveling businessman" who sold "narcotics and poison to the citizens of Chicago" was a permissible comment on defendant's specific crime supported by the evidence that defendant sold two packets of heroin to Louis from his vehicle on the streets of Chicago, engaged in a second hand-to-hand transaction with an unidentified man, and had a baggie containing 18 additional packets of heroin next to him in the vehicle at the time he was stopped by police. Although the State did not specifically prove at trial that heroin is, scientifically, poison, we believe that the dangers and ill effects of heroin are within the general knowledge of the average juror. Moreover, the term

"poison" does not refer only to things that cause death. The term can also refer to things that are generally "destructive or harmful" or to things that are objects of "aversion or abhorrence." *Poison*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/poison (last visited June 8, 2020). Accordingly, the State's reference to "poison" was a proper inference drawn from the evidence that defendant was selling heroin, a substance well-known to be destructive, harmful, and generally abhorred by society, even if the State did not specifically prove its chemically poisonous nature.

¶ 53    In addition, despite defendant's contention to the contrary, the challenged statement by the prosecutor does not speak to the general ills of society or the overall problem with crime in society. Rather, the comment refers only to the crime defendant was alleged to have committed and speaks only in terms of the negative effects of *defendant's* actions. See *People v. Johnson*, 208 Ill. 2d 53, (2003) ("To the extent that [*People v. Harris*, 129 Ill. 2d 123 (1989)] and the cases cited therein stand for the proposition that *limited* prosecutorial exhortations are proper where it is made clear to the jury that its ability to effect general and specific deterrence is dependent *solely* upon its careful considerations of the specific facts and issues before it, we will not disavow the holding of *Harris*.").

¶ 54    Moreover, the State's reference to the citizens of Chicago did not create an impermissible us-versus-them mentality between the jury and defendant. As discussed above, the evidence was that defendant was selling drugs on the streets of Chicago to people who were, obviously, within the City of Chicago. Accordingly, the statement that defendant sold narcotics to the citizens of Chicago was based on the evidence. There was nothing said by the State that expressly pitted the jurors against defendant or appealed to the jurors on a personal level, as has been present in the cases in which courts have found that the State created an us-versus-them mentality. See

*Wheeler*, 226 Ill. 2d at 129 (State's argument created improper us-versus-them mentality where jurors might feel compelled to side with the State to ensure their own safety); *Deramus*, 2014 IL App (1st) 130995, ¶ 59 (State's argument that the most important part of the case was what the defendant was "doing to us" was improper because it "improperly aligned the jury with the prosecution and against defendant").

¶ 55 We note that defendant takes issue with the principle that prosecutors may comment on the negative effects of a defendant's crime and urge the fearless administration of justice, because the principle dates back over one hundred years. Although defendant is correct that not all legal principles from so long ago remain applicable today, the mere fact that the principle originated many years ago does, in and of itself, mean that it has no application today. Moreover, defendant's reliance on *People v. Loferski*, 235 Ill. App. 3d 675 (1992), for the notion that this longstanding principle should be abandoned is misplaced. Certainly, the *Loferski* court stated that it found persuasive arguments against the use of closing arguments that refer to the broad "war on drugs" in this country. *Id.* at 689. Nevertheless, the *Loferski* court then went on to explain that the longstanding authority in Illinois is "that a prosecutor's rhetoric during closing argument that urges a conviction to fight societal evils is permissible argument concerning the evil results of crime and the fearless administration of the law" and that it was bound to follow Illinois law. *Id.* Accordingly, nothing about *Loferski* persuades us to deviate from this longstanding principle.

¶ 56 Defendant next argues that the State improperly vouched for the credibility of the police officer witnesses when it argued that the officers were just doing their jobs and had no motive or bias that would cause them to lie and that the State improperly argued defendant's prior felony conviction as propensity evidence. Defendant acknowledges that these alleged errors were not

properly preserved in that they were not included in defendant's written posttrial motion. Nevertheless, he urges us to review them on the basis of plain error. Under the doctrine of plain error, we may bypass normal forfeiture principles and review an otherwise forfeited error in two circumstances: (1) where the evidence was so closely balanced that the jury's guilty verdict might have resulted from the alleged error, and (2) where the error was so serious that the defendant was denied a substantial right and, thus, a fair trial. *People v. Cosby*, 231 Ill. 2d 262, 272 (2008). The first step in any plain error analysis is to determine whether an error occurred, because "[a]bsent reversible error, there can be no plain error." *Id.* at 273. We conclude that no reversible error occurred in either instance.

¶ 57 Defendant's contentions in these respects relate to a single segment of the State's rebuttal argument. The State argued as follows:

"These officers that testified here today and yesterday, they were doing their job. Their job is to go out on the street in an undercover capacity to find people that are willing to sell them heroin and try to shut it down, shut down what they're doing. They have no motive or bias or reason to come here and tell you what happened and what they saw and how their operation worked except that it happened. That it's the truth. You weigh all of those officers' testimony and there's no bias, no reason to tell you what happened because that's what happened, against this defendant, who has a felony conviction that proves to you that he's disregarded the law before."

¶ 58 Defendant initially contends that the State improperly bolstered and vouched for the credibility of the police officer witnesses when it argued that the officers were not biased, had no reason to lie, and were just doing their jobs. According to defendant, the State invoked the integrity of CPD to bolster the officers' credibility and argued that they were more credible by

virtue of their status as officers. Defendant also argues that whether the officers were biased or had a motive to lie was irrelevant to the question of whether or not defendant committed the alleged offenses.

¶ 59　　It is undisputed that the State is not permitted to argue that police officers are more credible by virtue of their profession. *People v. Adams*, 2012 IL 111168, ¶ 20. Here, we do not read anything in the complained-of argument that suggests that police officers are more credible simply for the fact that they are police officers, and defendant does not make any attempt to identify what language in the above-quoted language suggests that police officers are inherently more credible than other witnesses. Rather, it appears to us that the State was simply arguing that the officers were simply doing a run-of-the-mill bust, *i.e.*, their job, at the time they encountered defendant, and that there was nothing unique or unusual about the events that would provide an incentive for the officers to testify to something other than what happened.

¶ 60　　Certainly, we do not find the present facts analogous to those in the cases cited by defendant. In *People v. Ford*, 113 Ill. App. 3d 659, 662 (1983), the State made repeated references to the officer's status as a police officer, the length of her tenure as an officer, her credentials, and her affiliations to argue that she was more credible than the defendant: "Now, on the one hand, you have got Donna Kurlinkus. She is a sworn Warren County Deputy, and on the other hand you have got Paula Ford who, in the words of her attorney, is a drug addict"; "On the one hand you have got Donna Kurlinkus who, in addition to being a Warren County Deputy, is a person of impecable (sic) credentials versus an individual, Paula Ford, who by her own testimony to you people in her own community didn't trust"; "You have Donna Kurlinkus who is a member of the Multi-County Drug Enforcement Group, MEG, with eight years of integrity serving in this community versus the Defendant, Paula Ford, who, again, in the words of her

attorney, was a member of the drug scene"; "You have the agent, Donna Kurlinkus, a sworn police officer working on assignment to the Multi-County Drug Enforcement Group"; "Why would Donna Kurlinkus, a sworn Warren County Deputy, pull a charade like this and lie and perjure herself for a lousy 15 gram purchase of marijuana?"  Similarly, in *People v. Fields*, 258 Ill. App. 3d 912, 920-21 (1994), the State repeatedly argued that the officers were not lying, they were telling the truth, and they would not perjure themselves.  The State also asked why the officers would risk their jobs, careers, and pensions in the name of convicting the defendant.

¶ 61　　　　In the present case, the State did not expound upon the officers' status as officers, their credentials, or their length of service as evidence that they were more credible than the defense witnesses.  The State did not tell the jury that the officers had told the jury the truth or that they would not risk their esteemed positions in the name of lying against defendant.  Rather, the State simply argued that there was no evidence of motive to lie or bias on the part of the officers and that the jury should take that into consideration when it weighed the officers' testimony.  Accordingly, we do not find any merit to defendant's contention that the State argued that the officers were more credible by virtue of their positions as police officers.

¶ 62　　　　With respect to defendant's contention that the lack of bias or motive to lie on the part of the officers was irrelevant to the question of defendant's guilt, we again disagree.  Defendant repeatedly argues on appeal that the determination of defendant's guilt depended entirely on whether the jury believed the State's witnesses or defendant's witnesses.  Assuming without deciding that this was the case, we have a hard time understanding how the credibility of the officers—or any other witnesses—would not be highly relevant to the ultimate issue of defendant's guilt.  If the determination of defendant's guilt rose and fell on who the jury

believed, then whether the primary witnesses against the defendant were credible was of paramount importance.

¶ 63      Finally, even if the State did improperly invoke the officers' status in an attempt to bolster their credibility, we conclude that the State's remarks were in direct response to defendant's argument that the officers were not to be believed because their testimony did not match what actually happened. Where the State's arguments in rebuttal are invited by defense counsel's arguments in closing, the defendant cannot rely on the State's comments as error on appeal. *People v. Brown*, 172 Ill. 2d 1, 43 (1996); see also *Phagan*, 2019 IL App (1st) 153031, ¶¶ 65, 71-73 (State's comments that officers were "just doing their job. They're out there serving and protecting. We ask them to do that. We need the police," were invited by defense counsel's argument that the officers' testimony was given only to justify their actions of shooting).

¶ 64      Here, in closing argument, defense counsel argued that various errors and omissions in the State's case, including the errors and mistakes in the officers' reports called into question a conclusion that defendant was guilty:

"And Officer Randolph says, Well, it was a mistake because I was looking at the 1505 Fund Sheet and I copied the wrong serial number. It was the below. [*Sic*] But if you recovered the funds, why are you looking at a 1505 Fund Sheet after the operation? You should have the bills right in front of you and you can notate, copy down the serial numbers. It doesn't happen. *And there's a reason why it doesn't happen because these 1505 funds were not recovered.*

There's all sorts of cracks in this foundation and *we just simply can't let officers get up here and say what they want and just take it as truth.* You got to go deeper. These

cracks make this house fall apart. And they're not just mistakes and it's not just a little problem, it's not a big deal, it's more than that and it's more significant because you have an incredibly responsible role here. You're deciding what really happened here. *And it's not enough for just officers to make all these mistakes and say what they want to say. And what they say on this witness stand doesn't match up with what actually happened and what they actually did when you look at the reports.*

*\*\*\**

\*\*\* And what they [the State] put before you is just not right. It's not okay. *And it's simply not what happened.*"

(Emphasis added.) In the emphasized language above, defense counsel directly argues that what the officers testified to was not the truth and was not what happened and that the officers simply got up on the stand and testified to "what they want[ed] to say." Accordingly, we believe that the State's rebuttal argument that the officers had no reason to lie was invited by and in direct response to defense counsel's argument and, thus, did not constitute error.

¶ 65    Finally, defendant's contention that the State improperly argued his prior conviction as propensity evidence also does not constitute reversible error. Where, as here, a defendant's prior conviction is admitted into evidence for the sole purpose of assessing the defendant's credibility, it is improper for the State to later argue that conviction for the purpose of inflaming the jury or as evidence that defendant was more likely to have committed the charged offense. See *Fields*, 258 Ill. App. 3d at 919-20 (where the defendant's prior conviction was admitted for the purpose of judging his credibility as a witness, it was improper for the State to later dwell on the defendant's status as a convicted felon and served no purpose other than to inflame the jury and encourage a decision based on the defendant's criminal history). In fact, it is well established

that evidence of a defendant's prior convictions may not be admitted to demonstrate that the defendant had a propensity to commit crime. *People v. Lawler*, 142 Ill. 2d 548, 563 (1991).

¶ 66        Here, defendant takes no issue with the admission of his prior conviction for the purpose of assessing his credibility.  He argues, however, that the State went beyond credibility and argued that his prior conviction illustrated a propensity by defendant to commit crime when it argued, "You weigh all of those officers' testimony and there's no bias, no reason to tell you what happened because that's what happened, against this defendant, who has a felony conviction that proves to you that he's disregarded the law before."  Defendant objected to this statement, and the trial court sustained his objection and instructed the jury to disregard the statement.

¶ 67        Although we agree with the State that this comment was made in the larger context of a discussion of the various witnesses' credibility, we also find the statement that defendant's prior conviction "proves *** that he's disregarded the law before" somewhat troubling.  It suggests that because defendant disregarded the law before, he is more likely to have disregarded the law in this instance, *i.e.*, was more likely to have committed the charged offense.

¶ 68        Regardless, however, of whether this comment improperly suggested that defendant had a propensity for committing crimes because of his prior conviction, we conclude that any error was cured by the trial court's sustaining of defendant's objection, the trial court's admonishment of the jury to disregard the offending remark, and the jury instructions given.  Prejudice from improper closing arguments can be corrected by proper jury instructions, which carry more weight than counsel's arguments.  *People v. Green*, 2017 IL App (1st) 152513, ¶ 98.  A trial court's instruction that closing argument are not evidence greatly diminishes the prejudicial impact of improper closing arguments.  *Id.* at ¶¶ 98-99 (holding that any error in the State's

closing arguments was corrected by the trial court's instruction to the jury that closing arguments were not evidence and that any argument that conflicted with the evidence at trial should be disregarded). We presume that jurors follow the instructions given by the trial court. *Id.* at ¶ 98.

¶ 69     In *Lawler*, our Supreme Court held that the State improperly argued that the defendant's prior conviction created a legal presumption that the defendant was willing to lie. 142 Ill. 2d at 564. Although the Supreme Court found this argument to be improper, it held that it did not constitute reversible error, because the jury instructions given by the trial court cured the prejudicial effect of the improper argument. *Id.* at 565. More specifically, the trial court instructed the jury that the defendant's prior convictions should be considered in assessing the defendant's credibility and not his guilt; that any statement by counsel that was contrary to the evidence presented at trial should be disregarded; that the defendant was presumed guilty; and that the State had the burden of proving the defendant guilty beyond a reasonable doubt. *Id.* at 564. Similarly, this Court in *People v. Chapman*, 262 Ill. App. 3d 439, 456 (1992), held that any error in the State's arguments regarding the defendant's prior convictions was cured by instructions on the proper use of prior convictions and that closing arguments are not evidence.

¶ 70     Here, the trial court immediately sustained defendant's objection to the State's argument regarding defendant's prior conviction and admonished the jury to disregard the State's comment. In addition, the trial court instructed the jury that any evidence received for a limited purpose should not be considered for any other purpose; closing arguments are not evidence; any statements or arguments made by counsel that are not supported by the evidence should be disregarded; defendant is presumed innocent; the State had the burden to prove defendant guilty beyond a reasonable doubt; defendant's prior conviction could only be considered in assessing defendant's credibility as a witness; and defendant's prior conviction could not be considered as

evidence of his guilt of the charged offenses. We find these instructions to be more than sufficient to cure any prejudice that might have resulted from the State's comment on defendant's prior conviction. See *Lawler*, 142 Ill. 2d at 564; *Chapman*, 262 Ill. App. 3d at 456.

¶ 71    We note that defendant argues that proper jury instructions do not always cure the prejudicial impact of improper closing arguments and that the trial court's sustaining of defendant's objection and instruction that closing argument are not evidence was insufficient to cure the prejudicial impact in this case. As discussed above, however, the trial court did more than just sustain defendant's objection and instruct the jury that closing arguments are not evidence; it gave many instructions to the jury that worked to cure the impact of the State's comment, including that defendant's prior conviction should be considered only for the purpose of assessing defendant's credibility and for no other purpose. In addition, unlike the cases relied on by defendant, the State referred to defendant's prior conviction only once and did not return to the subject after the trial court sustained defendant's objection to the reference. See *People v. Jones*, 2016 IL App (1st) 141008, ¶ 25 ("Additionally, the State's repetition of the 'criminal' pejorative throughout its opening statement effectively nullified the effect of the court's instruction to disregard the State's characterization of defendant as well as its admonishment that opening statements were not evidence."); *Fields*, 258 Ill. App. 3d at 919-20 (State made repeated references to and dwelled on the fact that the defendant was a convicted felon); see also *People v. Sutton*, 353 Ill. App. 3d 487, 500-01 (2004) (the trial court's sustaining the defendant's objection to the State's improper closing argument was sufficient to cure any prejudicial impact where the State's comment was brief, isolated, and not repeated).

¶ 72    Moreover, defendant does not offer much explanation for why the prejudice from the State's comment was impervious to being cured by the numerous curative instructions given by

the trial court. Instead, defendant simply argues that because the State suggested that defendant's status as a convicted felon made him more likely to have committed the charged offenses, there was no curing any damage that might have been done. Defendant does not cite, and we have not found, any authority for the notion that improper propensity arguments are exempted from the general principle that proper jury instructions can cure the prejudicial effect of improper arguments, and the cases that are cited by defendant each explained the specific circumstances that made it impossible for proper jury instructions to cure the prejudicial effect. See *Jones*, 2016 IL App (1st) 141008, ¶¶ 24-25 (State's repeated characterization of the defendant as "criminal" was not cured by trial court's instructions and admonishments where the references were made in opening statements, before the defendant had an opportunity to make an opening statement, the defendant had no prior convictions, and the State continued to make such statements); *People v. Thomas*, 22 Ill. App. 3d 854, 857 (1974) (prejudice from the prosecutor's reference to the defendant as a "criminal" in an objection to defendant's cross-examination of a state witness could not be cured by the trial court's instruction to disregard where the defendant had never before been convicted of a crime and had not had an opportunity to present his case).

¶ 73 Because any prejudice that might have resulted from the State's comment on defendant's prior conviction was cured by the trial court's proper admonishments and instructions to the jury, the State's comment did not constitute reversible error.

¶ 74 In sum, we conclude that the State's comments characterizing defendant as a "traveling businessman" selling "narcotics and poison" were permissible comments on the evidence and the inferences to be drawn from the evidence. Defendant's claims of error regarding the State's arguments regarding the lack of bias and reason to lie and regarding defendant's prior conviction were not properly preserved for review. Although defendant urged their review under the plain-

error doctrine, because neither constituted reversible error, the plain-error doctrine is inapplicable. *Cosby*, 231 Ill. 2d at 273.

¶ 75                                     Police Reports

¶ 76       Defendant also requests that we review the trial court's *in camera* assessment that the police reports from the Collier investigation were not relevant to the charges against defendant in the present case, because they did not, as defense counsel suggested they might, indicate that defendant was targeted in the drug buy in order to gain his cooperation in Collier's case. We note that defendant does not object to the trial court having performed an *in camera* inspection, but instead simply requests that we review the propriety of the trial court's conclusion on the reports' relevance. The State does not object to this request, and we are vested with the power to conduct such a review. See *People v. Hooker*, 253 Ill. App. 3d 1075, 1081-82 (1993). The parties agree that the trial court's decision should not be disturbed absent an abuse of discretion. See *People v. Williams*, 209 Ill. 2d 227, 234 (2004).

¶ 77       We have reviewed the police investigation reports from the Collier investigation and determine that the trial court did not abuse its discretion in concluding that they do not contain any information relevant to the present case. More importantly, they do not contain anything that suggests or even remotely hints that defendant may have been targeted in the drug buy to secure his cooperation in the Collier investigation or that he was arrested and prosecuted in this case at the request of detectives in the Collier investigation or to secure his cooperation in the Collier investigation. Rather, the reports confirm the State's assertion that defendant was not identified in connection with the Collier investigation until a year *after* the events giving rise to the present case transpired. Moreover, as the trial court explained, at most, the reports contain a

summary of a statement defendant gave regarding his knowledge of the events at issue in the Collier investigation.

¶ 78     Accordingly, because the police investigation reports in the Collier investigation do not contain anything to support a claim that defendant was targeted by police in the current matter or that defendant's arrest and prosecution was requested by detectives in the Collier investigation, and because they do not otherwise contain any material relevant to the present case, we conclude that the trial court did not abuse its discretion in denying defendant's request for their production.

¶ 79                                    CONCLUSION

¶ 80     For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

¶ 81     Affirmed.